[No. S034539. July 25, 1994.]

DORIS HELLER, Plaintiff and Appellant, v.
NORCAL MUTUAL INSURANCE COMPANY et al., Defendants and
Respondents.

DORIS HELLER, Petitioner, v.
THE SUPERIOR COURT OF FRESNO COUNTY, Respondent;
NORCAL MUTUAL INSURANCE COMPANY et al., Real Parties in
Interest.

**COUNSEL**

Roger K. Vehrs, Thornton Davidson, Tritt & Tritt and James F. Tritt for Plaintiff and Appellant and for Petitoner.

Diehl, Steinheimer,. Riggio, Haydel & Mordaunt, M. Max Steinheimer, Bryan D. Smith, Joseph H. Fagundes, Anderson, Galloway & Lucchese, G. Patrick Galloway, Karen A. Sparks, Diepenbrock, Wulff, Plant & Hannigan, Dennis M. Campos, Sean O. Sheridan and John R. Haluck for Defendants and Respondents and for Real Parties in Interest.

Horvitz & Levy, David S. Ettinger, Richard L. Hasen, Greines, Martin, Stein & Richland, Timothy T. Coates and Barry M. Wolf as Amici Curiae on behalf of Defendants and Respondents and Real Parties in Interest.

No appearance for Respondent Superior Court.

**OPINION**

**LUCAS, C. J.**—In this case we consider whether unauthorized ex parte discussions that occur during the discovery phase of a medical malpractice action between a nonparty treating physician and the defendant physician's malpractice insurer, regarding the litigant patient's medical condition, violate either the Confidentiality of Medical Information Act (Civ. Code, § 56 et seq.; all statutory references are to this code unless otherwise indicated), or the constitutional right to privacy (Cal. Const., art. I, § 1).

We granted review to consider whether plaintiff's seventh and eighth causes of action in her fourth amended complaint state claims against defendants Dr. Kent Yamaguchi (plaintiff's treating physician), and Valley

Plastic Surgeons Medical Group, Inc. (Yamaguchi's medical services organization, and hereafter VPSMG), for violation of section 56 et seq., based on unauthorized ex parte discussions about plaintiff's medical condition that occurred between Yamaguchi and Norcal Mutual Insurance Company (hereafter Norcal), and other nonparties, during the discovery phase of a separate malpractice action plaintiff had filed against her original physician, Dr. Geis (Yamaguchi's associate).[1] Plaintiff filed the present action (to which Geis is not a party) after settling her lawsuit against Geis for $400,000.[2]

. We must also determine whether these same ex parte discussions support plaintiff's 12th cause of action against Yamaguchi and Norcal (Yamaguchi and Geis's malpractice insurer) for violation of plaintiff's constitutional right to privacy under article I, section 1 of the California Constitution.

As we explain, we conclude that because the purpose of the ex parte discussions was to assist Norcal in defending the malpractice action against Geis, Yamaguchi (and VPSMG) are exempt from liability under section 56.10, subdivision (c)(4) (hereafter, section 56.10(c)(4)), which allows health care providers and insurers to conduct ex parte discussions to facilitate preparation of a defense to a malpractice action. We also conclude that our recent decision in *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 [26 Cal.Rptr.2d 834, 865 P.2d 633] (hereafter, *Hill*) is dispositive in precluding plaintiff's 12th cause of action against Yamaguchi and Norcal for invasion of privacy. Plaintiff has failed to meet her *initial* burden under *Hill* of establishing that she had a reasonable expectation of privacy in the information that was disclosed during the discovery phase of her malpractice action. (See *Hill, supra,* 7 Cal.4th at pp. 36-37.) Accordingly, we reverse the Court of Appeal judgment to the extent it concludes plaintiff has stated a cause of action under these facts.

## FACTS

Our review arises out of the trial court's sustaining of defendants' demurrers to plaintiff's fourth amended complaint without leave to amend, and the

---

[1] As the complaint indicated, plaintiff does not claim Norcal violated the act by discussing her medical history with Yamaguchi. Indeed, plaintiff is barred from making such a claim because insurers are exempted from the act. Plaintiff's briefs are silent on the issue, but we note that insurers, once covered by section 56, were removed from its application in 1980 following the enactment, also in 1980, of Insurance Code section 791 et seq., which created the Insurance Information and Privacy Protection Act. This act limits "the disclosure of information collected in connection with insurance transactions . . . [and] enable[s] insurance applicants and policyholders to obtain the reasons for any adverse underwriting decision." (Ins. Code, § 791, added by Stats. 1980, ch. 1214, § 1, p. 4103; *id.,* § 791.01, subd. (f) [exempting insurers from § 56 et seq.].)

[2] According to Yamaguchi's deposition testimony, both he and Geis, as members of the Central California Faculty Medical Group, provide services to Sierra Hospital on an independent contractor basis.

Court of Appeal's reversal, in part, of the trial court judgment. We presume the facts recited in plaintiff's complaint are true and correct. (See *Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

In 1987, plaintiff was admitted to Sierra Hospital for removal of a bone spur from her left hand. Shortly after the surgery, she developed a postoperative staphylococcal infection, diagnosed and treated by Geis. As a direct result of the infection, plaintiff's third finger on her left hand had to be amputated in two separate surgeries. Both surgeries were performed by Geis, with Yamaguchi assisting. Thereafter, plaintiff dismissed Geis as her treating physician, believing his treatment of her was negligent. Yamaguchi continued to treat plaintiff for symptoms relating to the infection following the second operation. In 1988, plaintiff sued Geis for medical malpractice. Although Yamaguchi was not a party to the action, he agreed to appear as an expert defense witness on behalf of Geis.

During the discovery phase of the lawsuit, plaintiff deposed Yamaguchi, who revealed that Norcal conducted several private interviews with him (while he was still treating plaintiff), during which he discussed plaintiff's condition and prognosis and disclosed plaintiff's medical records. According to plaintiff, Yamaguchi also agreed with Norcal to testify falsely that the treatment provided to plaintiff by Geis was within the professional standard of care. Plaintiff claimed that Yamaguchi and Norcal attempted to coerce her into settling her case against Geis for significantly less than her eventual settlement of $400,000.

After settling her action against Geis, she brought the present action, claiming the disclosure of her medical information violated section 56 et seq., and her constitutional right to privacy. The trial court sustained defendants' demurrers without leave to amend against all but the negligence cause of action against Yamaguchi (which was not the subject of a demurrer), on the ground that defendants' conduct was immunized by the litigation privilege of section 47, subdivision (b) (hereafter section 47(b)), which immunizes from liability all *communications* that occur during the course of a judicial or quasi-judicial proceeding. (See *Rubin* v. *Green* (1993) 4 Cal.4th 1187, 1196 [17 Cal.Rptr.2d 828, 847 P.2d 1044] [hereafter, *Rubin*] [acts related to litigation and essentially communicative, as opposed to *conduct*, are privileged under section 47(b)]; *Kimmel* v. *Goland* (1990) 51 Cal.3d 202, 211 [271 Cal.Rptr. 191, 793 P.2d 524] [distinguishing between injury arising from communicative acts immunized under section 47(b) and injury arising from noncommunicative *conduct* unprotected by litigation privilege].)

Plaintiff appealed from the judgment of dismissal. In addition, plaintiff sought a writ of mandate compelling the trial court to set aside its order

sustaining the demurrers of Yamaguchi without leave to amend. The Court of Appeal consolidated the appeal with the mandamus action and ultimately reversed the portion of the trial court judgment to the extent that it sustained the demurrers to the seventh and eighth causes of action against Yamaguchi and VPSMG, and the ninth cause of action against Dr. Boro (an associate of Yamaguchi and Geis, against whom the lawsuit was dismissed after the Court of Appeal judgment became final), for wrongful disclosure of confidential medical information in violation of the act. The court also reversed the trial court's dismissal of the 12th cause of action against Norcal and Yamaguchi for breach of plaintiff's state constitutional right to privacy. The court affirmed the judgment of dismissal in favor of defendant Central California Faculty Medical Group.

In reversing the trial court judgment in part, the Court of Appeal observed that although the medical information obtained by Norcal from Yamaguchi may have been legally discoverable during the course of the Geis litigation, the *method* used to discover the information (i.e., private conversations that took place before the issuance of subpoenas and notice of depositions), violated section 56 et seq. and plaintiff's constitutional right to privacy. In so holding, the court rejected as irrelevant defendants' claims that section 56.10(c)(4) renders inapplicable the prohibition of disclosure in section 56.10.

The court also rejected defendants' claim that the actions were barred by the litigation privilege of section 47(b), which immunizes from liability publications or broadcasts made: In any (1) legislative or (2) judicial proceeding, or (3) in any other official proceeding authorized by law "to achieve the objects of the litigation . . . [and] that have some connection . . . to the action." (*Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 212 [266 Cal.Rptr. 638, 786 P.2d 365] [hereafter, *Silberg*].) The court concluded that the litigation privilege did not bar recovery of damages because plaintiff based her claims on defendant's *conduct* rather than on *publication* or *disclosure* of the information which, the court conceded, would have been barred by section 47(b). (See *Rubin, supra*, 4 Cal.4th at p. 1187.)

Defendants Yamaguchi and VPSMG challenge the Court of Appeal's reversal of the trial court's dismissal of the seventh and eighth causes of action for violation of section 56 et seq., and Yamaguchi and Norcal challenge the Court of Appeal's reversal of the order dismissing the twelfth cause of action for violation of plaintiff's constitutional right to privacy. The California Medical Association, the California Association of Hospitals and Health Systems, the California Dental Association, the County of Los Angeles and the Regents of the University of California have filed amicus curiae briefs on behalf of defendants.

## DISCUSSION

### 1. *Section 56 et seq.*

Section 56 was originally enacted in 1979 "to provide for the confidentiality of individually identifiable medical information, while permitting certain reasonable and limited uses of that information." (Stats. 1979, ch. 773, § 1, p. 2645.) The original act caused several interpretative problems and was described in a legislative analysis as "[o]rganizationally . . . a singular horror, cluttered with superfluous and ambiguous provisions." (Sen. Com. on Judiciary, Background Information to Sen. Bill No. 889.) In 1981, the act was repealed and reenacted (Stats. 1981, ch. 782, §§ 1.5, 2, p. 3040).

As reenacted, section 56.10, subdivision (a), provides: "No provider of health care shall disclose medical information regarding a patient of the provider without first obtaining an authorization, except as provided in subdivision (b) or (c)." Section 56.20 requires health care providers to establish procedures to ensure the confidentiality of patient medical information, and section 56.26, subdivision (a), prohibits third party administrators of health plans from disclosing medical information processed in connection with performing administrative services. Considered together, the statutory provisions require a health care provider to hold confidential a patient's medical information unless the information falls under one of several exceptions to the act.

Sections 56.35 and 56.36 provide remedies for violations of the act, including compensatory damages, punitive damages not to exceed $3,000, attorney fees not to exceed $1,000, and costs of suit. Section 56.36 makes a violation a misdemeanor if the patient suffers economic loss or personal injury.

Thus, in order to violate the act, a provider of health care must make an unauthorized, unexcused disclosure of privileged medical information. A provider is relieved from liability under the act if it can show that the disclosure is excepted either by the mandatory (§ 56.10, subd. (b)) or permissive (§ 56.10(c)(4)) provisions of the act, allowing disclosure of medical information under specified circumstances.

■ Plaintiff claims that by disclosing her medical information to Norcal without her authorization, defendants violated the act. We agree with defendants and amici curiae, however, that defendants' ex parte contact with Norcal was contemplated by the permissive exception to the act under section 56.10(c)(4).

Section 56.10(c)(4) provides that a health care provider *may* disclose medical information to "persons or organizations insuring, responsible for, or defending professional liability which a provider may incur, if the . . . organizations, or persons are engaged in reviewing the competence . . . of health care professionals or in reviewing health care services with respect to medical necessity, level of care, quality of care, or justification of charges." (§ 56.10(c)(4).) This exception to the provisions of section 56.10 allows a provider of health care to disclose medical information without patient authorization "to persons or organizations insuring, responsible for, or defending professional liability." Under our canons of construction, we look to the language of the statute itself to determine if the ordinary meaning is unambiguous; if so, the statutory language controls, and there is no need to look to legislative intent for construction or interpretation. (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

The plain meaning of section 56.10(c)(4) is clear: Yamaguchi, as a health care "provider," and Norcal, as an organization "responsible for, or defending professional liability," were specifically exempted from the act in one of two ways. First, as an associate of Geis, and as plaintiff's treating physician, Yamaguchi was certainly at risk of medical malpractice exposure. Indeed, that risk became a reality when plaintiff filed the present action against Yamaguchi and included a cause of action for professional negligence, which is still viable and not at issue in this appeal. Accordingly, as a potential litigant in a malpractice action *and* a provider who "may incur" malpractice liability, Yamaguchi was permitted to discuss with Norcal plaintiff's medical condition under section 56.10(c)(4).

Justice Mosk's concurring and dissenting opinion assumes section 56.10 (c)(4) describes only *to whom* confidential medical information may be disclosed, without allowing such disclosure by "the doctor who possesses the records." (Conc. and dis. opn. of Mosk, J., *post*, p. 49.) This description of the statutory exception is misleading, for it fails to acknowledge that section 56.10 (c)(4) must be read in conjunction with section 56.10, subdivision (a), which makes it clear that the former exception applies to medical providers. As noted above, section 56.10, subdivision (a), specifically states that "no *provider* of health care shall disclose medical information . . . except as provided in subdivision (b) or (c)." (Italics added.) By stating that the statute as a whole applies to medical providers, the Legislature has also made it clear that it is the medical provider alone who may invoke the statutory exceptions. Thus, the concurring and dissenting opinion fails to read the applicable statutory language in pari materia and ignores the fundamental canon of statutory interpretation to "give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative purpose."

(*Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1159 [278 Cal.Rptr. 614, 805 P.2d 873].)

Other provisions of the act support our interpretation. Section 56.105 provides that any demand for settlement or compromise of a medical malpractice claim made by a potential plaintiff "prior to the service of a complaint upon a defendant," must be accompanied by an authorization to disclose medical information "to persons or organizations insuring, responsible for, or defending professional liability" regarding that claim. (§ 56.105.) Looking to legislative history for an analysis of the effect of section 56.105 on section 56.10(c)(4), we find that section 56.105 supports our interpretation of the exception.

The Legislative Counsel's Digest describes section 56.105 as follows: "Existing law prohibits the release or disclosure of medical information about a patient without an authorization except in specified circumstances, including disclosure to persons insuring, responsible for, or defending professional liability.

"This bill would provide that whenever, prior to service of a complaint in an action arising out of the professional negligence of a physician, a demand for settlement or offer of compromise is made, the demand or offer shall be accompanied by an authorization to disclose medical information to persons or organizations insuring, responsible for, or defending professional liability." (Legis. Counsel's Dig., Sen. Bill No. 1229 (1985-1986 Reg. Sess.).)

Thus, legislative history demonstrates that prior to the enactment of section 56.105, the Legislature contemplated that a health care provider could lawfully disclose a patient's medical information to "persons or organizations insuring, responsible for, or defending professional liability" when those persons or organizations were evaluating or defending potential malpractice claims. Section 56.105 was therefore enacted to further protect defendants from any claim that disclosure of medical information in the context of preparing a defense to a potential malpractice claim violated the Confidentiality of Medical Information Act.

Finally, section 56.16 supports defendants' view of permissive disclosure under section 56.10(c)(4). That section provides: "Unless there is a specific written request by the patient to the contrary, nothing in this part shall be construed to prevent a provider, upon an inquiry concerning a specific patient, from releasing at its discretion any of the following information: the patient's name, address, age, and sex; a general description of the reason for treatment (whether an injury, a burn, poisoning, or some unrelated condition); the general nature of the injury, burn, poisoning, or other condition;

the general condition of the patient; and any information that is not medical information as defined in subdivision (c) of Section 56.05." (§ 56.16.)

As the above provisions show, section 56 et seq. contemplates release of medical information either to enable a potential defendant to prepare a defense to a medical malpractice claim or to facilitate resolution of a claim prior to filing of a lawsuit. Read together, the permissive and mandatory exceptions to section 56 et seq. enable parties to conduct time-saving and cost-efficient investigation and settlement of patient claims.

Plaintiff asserts that the common law prohibits ex parte contacts between physicians and their insurers and allows communication during "formal discovery" proceedings only in order to protect physician-patient confidentiality. Plaintiff relies on *Torres* v. *Superior Court* (1990) 221 Cal.App.3d 181, 187 [270 Cal.Rptr. 401] (hereafter, *Torres*) to support her position. (Accord, *Province* v. *Center for Women's Health & Family Birth* (1993) 20 Cal.App.4th 1673, 1684-1687 [25 Cal.Rptr.2d 667] [hereafter, *Province*].)

The *Torres* court was asked to determine whether a nonparty physician who treated a malpractice claimant may testify as an expert for the defense on the standard of care employed by subsequent treating physicians. Although the plaintiff had conceded a "limited waiver" of his statutory physician-patient privilege as defined in Evidence Code section 994, he contended that the doctor owed him a "fiduciary duty to refuse affirmative assistance to [his adversary] in litigation respecting his physical condition." (*Torres*, *supra*, 221 Cal.App.3d at p. 184; accord, *Province*, *supra*, 20 Cal.App.4th at p. 1684.)

The *Torres* court held that the physician could testify subject to a protective order prohibiting ex parte interviews between defendant's counsel and the physician-expert witness to ensure plaintiff's physician-patient relationship would remain protected. (*Torres*, *supra*, 221 Cal.App.3d at p. 188.) Plaintiff asserts that *Torres* essentially prohibits all ex parte communication between a physician and his patient's adversaries in litigation.

*Torres* is inapposite. The Confidentiality of Medical Information Act was not an issue in the case. Dr. Yamaguchi never testified, and plaintiff never challenged his ability to do so. Nonetheless, to the extent *Torres* and *Province* could be read to prohibit all ex parte contacts between a physician and his attorneys or insurers, in conflict with this opinion, those cases are disapproved.

On the basis of the foregoing analysis, we conclude that defendants did not violate section 56 et seq. by discussing plaintiff's medical condition with their insurer Norcal. The statute is clear that the discussions between Yamaguchi and Norcal were excepted from liability, and plaintiff has failed to convince us that we should disturb the statutory scheme. Should the Legislature deem it necessary to further limit access to a plaintiff's medical condition, it is free to do so by amendment. Our conclusion obviates the need to discuss application of the litigation privilege of section 47(b) to plaintiff's claim of violation of section 56 et seq.

## 2. *Constitutional Right of Privacy*

 Plaintiff's 12th cause of action names as defendants Yamaguchi and Norcal only, and alleges that Yamaguchi secretly disclosed confidential information to Norcal and its agents and employees in violation of plaintiff's constitutional right to privacy under article I, section 1 of the California Constitution. The Court of Appeal reversed the trial court's dismissal of plaintiff's privacy action, relying on *Urbaniak* v. *Newton* (1990) 226 Cal.App.3d 1128 [277 Cal.Rptr. 354] (hereafter *Urbaniak*), which held that an alleged unauthorized disclosure of the plaintiff's HIV status (leading to the denial of worker's compensation benefits) gave rise to an action for a violation plaintiff's constitutional right to privacy. This right, the Court of Appeal determined, cannot be defeated by the litigation immunity conferred by section 47(b) because a statute cannot immunize from liability conduct made actionable by the California Constitution. (See *Urbaniak* v. *Newton, supra*, 226 Cal.App.3d at p. 1138; see also *Rancho La Costa, Inc.* v. *Superior Court* (1980) 106 Cal.App.3d 646, 667 [165 Cal.Rptr. 347] [judicial privilege cannot defeat claim of federal privacy interest].)

Although the *Urbaniak* decision may have been correct in its discussion of the right to privacy in the context of unauthorized disclosure of a patient's HIV status, we view the present plaintiff's privacy claims in a different light. Specifically, this claim must be analyzed under our recent decision in *Hill, supra*, 7 Cal.4th 1.[3]

 In *Hill, supra*, we held that "a plaintiff alleging an invasion of privacy in violation of the state constitutional right to privacy must establish

---

[3]We do not remand the case to allow plaintiff to replead her cause of action for invasion of privacy in light of *Hill* because plaintiff filed her answer brief on February 22, 1994, after we had filed *Hill*. Indeed, plaintiff recognizes that "*Hill* is controlling and prescribes the method in this state for balancing countervailing interests."

each of the following: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." (*Hill, supra*, 7 Cal.4th at pp. 39-40.)

We also noted in *Hill*, however, that "[a] defendant may prevail in a state constitutional privacy case by negating any of the three elements just discussed or by pleading and proving, as an affirmative defense, that the invasion of privacy is justified because it substantively furthers one or more countervailing interests. Plaintiff, in turn, may rebut a defendant's assertion of countervailing interests by showing there are feasible and effective alternatives to defendant's conduct having a lesser impact on privacy interests." (7 Cal.4th at p. 40.) We held that "in cases where material facts are undisputed, adjudication as a matter of law may be appropriate." (*Ibid.*)

■ We conclude that, as a matter of law, plaintiff has failed to state a cause of action for invasion of her state constitutional privacy interest. This conclusion is based on the fact that plaintiff did not adequately plead facts supporting a conclusion that any expectation of privacy as to her medical condition would be reasonable under the circumstances of this case. Thus, plaintiff has failed to establish the second essential element of a state constitutional cause of action for invasion of privacy.[4]

In *Hill*, we held that the extent of a privacy interest is dependent on the circumstances. We emphasized that "[e]ven when a legally cognizable privacy interest is present, other factors may affect a person's reasonable expectation of privacy. For example, advance notice of an impending action may serve to ' "limit [an] intrusion upon personal dignity and security that would otherwise be regarded as serious." ' " (7 Cal.4th at p. 36.)

By placing her physical condition in issue in the Geis litigation, plaintiff's expectation of privacy regarding that condition was substantially lowered by the very nature of the action. ■ As we stated in *Hill, supra*, 7 Cal.4th at page 37, a " 'reasonable' expectation of privacy is an objective entitlement founded on broadly based and widely accepted community norms. (See e.g., Rest.2d Torts, [] § 652D, com. (c) ['The protection afforded to the plaintiff's interest in his privacy must be relative to the customs of the time and

---

[4]Plaintiff's allegations concerning Yamaguchi's disclosure to Norcal of her financial and emotional state do not fall within the protection of either section 56 et seq. or the constitutional right to privacy, for the information is unrelated to her medical condition. (§ 56.05, subd. (b) [section 56 et seq. applies to disclosure of "medical information" only]; see *Kizer* v. *Sulnick* (1988) 202 Cal.App.3d 431, 439 [248 Cal.Rptr. 712] [if communication not made to obtain diagnosis, pursuit of claim for damages is inconsistent with reasonable expectation of privacy in matters relating to medical condition].)

place, to the occupation of the plaintiff and to the habits of his neighbors and fellow citizens.'].)" ▮▮▮▮ Hence, even assuming arguendo that a breach of section 56.10 duties occurred, the information that Norcal discovered in the conversations between Dr. Yamaguchi and Norcal would have been inevitably discovered during the course of the Geis litigation because Dr. Yamaguchi was scheduled as an expert witness for the defense.[5] Any expectation on plaintiff's part that such information would remain confidential was thus unreasonable.

▮ Finally, as we observed in *Hill, supra,* 7 Cal.4th at page 37, when determining the existence (or not) of a constitutionally protected claim, we must weigh the severity of each potential invasion of privacy: "No community could function if every intrusion into the realm of private action, no matter how slight or trivial, gave rise to a cause of action for invasion of privacy. . . . Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right. Thus, the extent and gravity of the invasion is an indispensable consideration in assessing an alleged invasion of privacy."

▮ The discussions between Yamaguchi and Norcal could not be considered sufficiently serious in their scope or impact to give rise to an actionable invasion of privacy. (*Hill, supra,* 7 Cal.4th at p. 37.) Because the information would most likely have been discovered during the ordinary course of litigation, defendants' conduct in revealing information about plaintiff's treatment and physical condition does not violate the state constitutional guarantee against invasion of privacy as a matter of law. Accordingly, we need not reach plaintiff's claim that a constitutional invasion of privacy defeats application of the litigation privilege.

---

[5]By filing a medical malpractice action against Dr. Geis, plaintiff was certainly aware that her medical condition would be an issue. Defendants now claim that this awareness, *by itself,* constituted a waiver of the doctor-patient privilege under Evidence Code section 996 and rendered section 56.10 inapplicable. We reject this contention. Under Evidence Code section 996, subdivision (a), the physician-patient relationship is waived "as to a communication relevant to an issue concerning the condition of the patient if such issue has been tendered by: [¶] (a) The patient." The allegations in the present action are based on communications made in the first lawsuit against Geis. By suing Geis for malpractice, plaintiff may have waived any doctor-patient confidentiality surrounding Geis's treatment of her hand, but she did not, in that lawsuit, waive the doctor-patient privilege as to confidential information she relayed to defendant Yamaguchi. For these same reasons, we decline Norcal's request to judicially notice various discovery documents from the Geis litigation (including a subpoena duces tecum directed at discovering Yamaguchi's business records), because the documents are unnecessary to our discussion of plaintiff's state constitutional right to privacy. (Evid. Code, § 452, subd. (d).)

### 3. *Plaintiff's Remaining Claims*

■ Plaintiff asserts the Court of Appeal erred in upholding the trial court judgment sustaining defendants' demurrers to the second through sixth, and eleventh, causes of action. As the Court of Appeal observed, these causes of action are all grounded on common law torts—negligent and intentional infliction of emotional distress, interference with the physician-patient relationship, and concealment. Plaintiff claims she suffered injury because, in her litigation against Geis, defendants used information they had wrongfully obtained. The Court of Appeal held that the litigation privilege of section 47(b) prevents recovery on these causes of action.

We agree with the Court of Appeal. We have consistently held that communications occurring during the course of litigation are absolutely privileged under section 47(b) and cases interpreting the statute. (*Rubin, supra,* 4 Cal.4th at p. 1194.) The policy behind the privilege, "to afford litigants and witnesses . . . the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions," is equally applicable to the tort causes of action in the present litigation. (*Silberg, supra,* 50 Cal.3d at p. 213, citation omitted.)

■ Finally, plaintiff asserts that the Court of Appeal erroneously affirmed the trial court's judgment sustaining defendants' demurrer to the 10th cause of action against Yamaguchi, VPSMG, and Norcal for conspiring to commit unfair business practices in violation of Business and Professions Code section 17200 et seq. As the Court of Appeal correctly noted, damages are not available for claims under the Unfair Business Practices Act. (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1266 [10 Cal.Rptr.2d 538, 833 P.2d 545].)

### Conclusion

We conclude that plaintiff has failed to state a cause of action for violation of section 56 et seq. because defendants are exempted under the act by section 56.10(c)(4). In addition, we conclude that plaintiff has failed to state a cause of action for violation of the constitutional right to privacy under article I, section 1 of the state Constitution. (*Hill, supra,* 7 Cal.4th at pp. 35-39.) Plaintiff does not plead that she has either a legally protected privacy interest, or a reasonable expectation of privacy, in information that would eventually have been discovered in litigation. Moreover, in our view, plaintiff has not alleged a sufficiently serious invasion of her privacy interest to

warrant actionable relief under the privacy clause of our state Constitution. (7 Cal.4th at pp. 53-54.) The Court of Appeal's judgment as to the seventh, eighth, and twelfth causes of action is reversed. In all other respects, the judgment is affirmed.

Arabian, J., Baxter, J., George, J., and Peterson, J.,* concurred.

**MOSK, J.,** Concurring and Dissenting.—

## I

The majority assert that the Confidentiality of Medical Information Act (Civ. Code, § 56 et seq.; hereafter the Act)[1] permits a doctor to disclose a patient's medical records, without any authorization from the patient, to a malpractice insurer if the doctor fears he or she "may incur" malpractice liability. I am not persuaded.

The purpose of the Act is to provide reasonable protection for the confidentiality of patient's medical records. (Stats. 1981, ch. 782, § 1, p. 3040.) "It is the intention of the Legislature in enacting this act, to provide for the confidentiality of individually identifiable medical information, while permitting certain reasonable and limited uses of that information." (*Ibid.*)

The basic scheme of the Act is that a medical provider must not disclose medical information without a written authorization from the patient. There are exceptions. Thus, section 56.10 provides that "[n]o provider of health care shall disclose medical information regarding a patient of the provider without first obtaining an authorization, except as provided in subdivision (b) or (c)."

Before I examine the exceptions, it is important to consider what sort of authorization the Legislature requires pursuant to its basic rule. The Legislature has been quite demanding. An authorization is valid if it is handwritten or typed in legible type on a separate piece of paper and is properly signed and dated by the patient or enumerated substitutes. (§ 56.11, subds. (a), (b) & (c).) The authorization must state ". . . the specific uses and limitations on the types of medical information to be disclosed . . . [,] [¶] . . . the name or functions of the provider of health care that may disclose the medical information . . . [,] [¶] . . . the name or functions of the persons or entities authorized to receive the medical information . . . [,]

---

*Presiding Justice, Court of Appeal, First Appellate District, Division Five, assigned by the Acting Chairperson of the Judicial Council.

[1]All statutory references are to the Civil Code unless otherwise indicated.

[¶] . . . the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information . . . [,] [¶] . . . a specific date after which the provider of health care is no longer authorized to disclose the medical information," and that the person signing the authorization has been advised of the right to receive a copy of the authorization. (§ 56.11, subds. (d)-(i).)

These provisions demonstrate an interest in assuring that medical information be disclosed only for a narrowly defined purpose, to an identified party, for a limited period of time.

The authorization is not a mere formality that may be overlooked, but is, under normal circumstances, a sine qua non. We can see this because sometimes the patient is *required* to provide an authorization. (§ 56.105.) In a section that is highly relevant to this case, the Legislature has required the patient to supply an authorization when, prior to filing a complaint, he or she serves a demand letter or offer of compromise in a claim for professional negligence. (*Ibid.*) The section covers the problem of informal discovery (formal discovery is treated in § 56.10, subd. (b)), and specifies that "[t]he authorization shall be in accordance with Section 56.11 and shall authorize disclosure of that information that is necessary to investigate issues of liability and extent of potential damages in evaluating the merits of the demand for settlement or offer to compromise." (§ 56.105.)

The disclosure in this case was not made pursuant to any authorization, nor does there appear any claim that plaintiff should have provided an authorization under section 56.105.

The question remains whether any of the statutory exceptions to the authorization requirement apply.

The Act provides that disclosure is required even in the absence of an authorization when compelled by court order, subpoena, or search warrant or "otherwise specifically required by law." (§ 56.10, subd. (b)(1)-(7).) It is undisputed that these provisions do not apply here.

The Act also provides that disclosure is permissible without an authorization in several types of situations. Disclosure is permissible to other health care providers "for purposes of diagnosis or treatment of the patient." (§ 56.10, subd. (c)(1).) Disclosure is permissible to an entity responsible for paying a medical bill (and to billing services) "to the extent necessary to allow responsibility for payment to be determined and payment to be made." (§ 56.10, subd. (c)(2) & (3).)

Disclosure is permissible to groups performing peer review "or to persons or organizations insuring, responsible for, or defending professional liability which a provider may incur," if the groups or persons "are engaged in reviewing the competence or qualifications of health care professionals or in reviewing health care services with respect to medical necessity, level of care, quality of care, or justification of charges." (§ 56.10, subd. (c)(4).)

Disclosure is also permissible for the purpose of licensing or accrediting a provider of health care (§ 56.10, subd. (c)(5)); for the purpose of a coroner's investigation (§ 56.10, subd. (c)(6)); for bona fide medical research (§ 56.10, subd. (c)(7)); for certain employment-related claims relevant to an employee's lawsuit against an employer (§ 56.10, subd. (c)(8)); in connection with certain coverage claims (§ 56.10, subd. (c)(9)); to a group practice plan for the purpose of administering the group practice plan (§ 56.10, subd. (c)(10)); to insurance agents in compliance with certain Insurance Code provisions (§ 56.10, subd. (c)(11)); to a probate court investigator under specified circumstances (§ 56.10, subd. (c)(12)); to a tissue bank under specified circumstances (§ 56.10, subd. (c)(13)), and when the disclosure "is otherwise specifically authorized by law." (§ 56.10, subd. (c)(14).)

The majority hold that the exception described in section 56.10, subdivision (c)(4) covers the circumstances of this case. I disagree. The majority fail to examine the entire subdivision and to read the applicable language in pari materia.

Section 56.10, subdivision (c)(4) permits disclosure "to organized committees and agents of professional societies or of medical staffs of licensed hospitals, or to licensed health care service plans, or to professional standards review organizations, or to utilization and quality control peer review organizations as established by Congress in Public Law 97-248 in 1982, or to persons or organizations insuring, responsible for, or defending professional liability which a provider may incur, if the committees, agents, plans, organizations, or persons are engaged in reviewing the competence or qualifications of health care professionals or in reviewing health care services with respect to medical necessity, level of care, quality of care, or justification of charges."

The majority assert that because Dr. Yamaguchi was in danger of medical malpractice exposure as the associate of a doctor whom his patient was already suing, Dr. Yamaguchi came under section 56.10, subdivision (c)(4) as a provider who "may incur" malpractice liability. (Maj. opn., *ante*, p. 39.)

The interpretation is ungrammatical. The term "professional liability which a provider may incur" is part of an entire adjectival clause that

modifies the term "persons or organizations." (§ 56.10, subd. (c)(4).) The clause describes persons or organizations *to whom* information may be disclosed, not, as the majority suggest, persons who may *disclose* information.

The phrase specifies that the persons or organizations to whom medical information may be disclosed must be those that are insuring or are responsible for or are defending malpractice liability. It does not describe under what circumstances the disclosure may be made, but merely describes the recipient. The language describing under what circumstances the disclosure may be made comes later in the paragraph, starting with the word "if."

Thus the phrase upon which the majority rely does not mean that a doctor who is afraid he or she—or an employee—"may incur" malpractice liability may disclose patient's records to the insurer. Nor does it mean that a doctor would be a "person defending professional liability," because throughout the Act, doctors are referred to as "providers." And, as I have noted, the section describes persons and organizations *to whom* information may be disclosed. This description does not refer to the doctor who possesses the records. In any case, there is certainly no evidence that Dr. Yamaguchi was defending *his* professional liability when he made the disclosures—nor am I aware of any evidence in the record before us establishing that Dr. Yamaguchi actually "might incur" malpractice liability at the time he made the disclosure.

The majority also claim that the term "quality of care" includes the question of malpractice liability, so that an insurer defending a malpractice claim would be a proper recipient of disclosure under section 56.10, subdivision (c)(4). (Maj. opn., *ante*, p. 39.)

Such an interpretation is inconsistent with the general purpose of the Act to restrict disclosure of medical records except as specifically provided by the Act, and renders the particular provision of the Act regarding informal discovery in malpractice actions meaningless surplusage. It is also inconsistent with the general purpose of the subdivision. Finally, it would interpret the phrase "quality of care" as referring to malpractice liability, though a different term has been used in the statute that applies specifically to malpractice actions.

We should not interpret isolated phrases in section 56.10, subdivision (c)(4), but should interpret the whole paragraph in order to ascertain and carry out the Legislature's intent. It is a principle of statutory construction that the meaning of a word may be determined by reference to other terms

that are associated with it in the same statute. (*People* v. *Rogers* (1971) 5 Cal.3d 129, 142 [95 Cal.Rptr. 601, 486 P.2d 129] (conc. and dis. opn. of Mosk, J.) [discussing doctrine of *noscitur a sociis*].) "[W]hen a statute contains a list or catalogue of items, a court should determine the meaning of each by reference to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope. . . . In accordance with this principle of construction, a court will adopt a restrictive meaning of a listed item if acceptance of a more expansive meaning . . . would otherwise make the item markedly dissimilar to the other items in the list." (*Moore* v. *California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1011-1012 [9 Cal.Rptr.2d 358, 831 P.2d 798].) The majority opinion fails to follow this directive, instead choosing to interpret isolated phrases without reference to the whole.

Section 56.10, subdivision (c)(4) should be interpreted so that the term "quality of care" means something similar for each entity described by the paragraph. What each entity has in common is its function in reviewing quality of care for the purpose of determining whether the physician is good enough to receive the imprimatur of the group requesting the information, whether it be for peer recognition or rating services, extending group practice or hospital staff privileges or providing insurance coverage. An insurer deciding whether to offer or continue malpractice insurance to a provider stands in need of patient records for substantially the same reason as the various other entities enumerated in the paragraph. I would conclude that the statute should be interpreted to permit providers to disclose patient information to insurers, without any patient authorization, only for such a purpose.

My interpretation is supported by legislative history. When this subdivision was first enacted, it was labeled "For peer review of physicians." (Former § 56.15, subd. (c)(2)(A); Stats. 1979, ch. 773, § 1, p. 2648.) The subdivision permitted disclosure to "organized committees of professional societies, including components or subsidiaries thereof, or of medical staffs of licensed hospitals, or to professional standards review organizations organized in a manner which makes available professional competence to review professional competence or qualifications or health care services with respect to medical necessity, *quality of care*, or economic justification of charges or level of care." (*Ibid.*, italics added.)

In 1981, the Act was revised, adding section 56.10, subdivision (c)(4) in substantially the same form as it now appears. The new subdivision added the reference to insurers upon which the majority rely, but retained the qualification that the persons or organizations to whom disclosure is made

must be engaged in reviewing professional competence or qualifications or in reviewing medical necessity, level of care, *quality of care*, or justification of charges. (Stats. 1981, ch. 782, § 1, p. 3042, italics added.)

We should infer that "quality of care" means basically the same term it meant in 1979, that is, that the information is to be disclosed only if the organizations or persons seeking disclosure are engaged in determining whether a provider is adequately qualified to receive the organization or person's approval, membership or services.

Defending a malpractice action does not meet this qualification. In such circumstances, the issues are liability and damages, not competence or qualification. When the Legislature has wished to describe the function of a malpractice carrier in defending a claim for malpractice, it has described that function in quite different terms than are used in section 56.10, subdivision (c)(4). Thus, section 56.105 requires the patient to authorize disclosure of "that information that is necessary to *investigate issues of liability and extent of potential damages*." (Italics added.)

We must read sections 56.105 and 56.10, subdivision (c)(4) in pari materia. They are part of the same act and should be harmonized to carry out the intent of the Legislature and give effect to both provisions. (*City of Huntington Beach* v. *Board of Administration* (1992) 4 Cal.4th 462, 468 [14 Cal.Rptr.2d 514, 841 P.2d 1034]; *Dyna-Med* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) An interpretation of section 56.10, subdivision (c)(4) that permits a doctor to disclose medical information because a malpractice insurer is investigating a malpractice claim would make section 56.105 meaningless, and would fail to give it any effect.

I cannot understand the majority's claim that section 56.105 supports its interpretation. (Maj. opn., *ante*, p. 40.) Section 56.105 was enacted after section 56.10, subdivision (c)(4). The Legislature, when it enacted section 56.105, thought it necessary to provide for precomplaint disclosure of medical information in malpractice actions. It would not have done so had it considered that section 56.10, subdivision (c)(4) already permitted such disclosure. The Legislative Counsel's Digest upon which the majority rely for a contrary conclusion does not define the nature of the disclosure that could be made to malpractice insurers under existing law, and, in any event,

the Legislature's own action is far more probative of its intent than a broad, general statement of the Legislative Counsel.[2]

The majority claim that its interpretation is necessary to serve the goal of reasonable, informal pretrial discovery in order to promote settlement. But this goal is already served by section 56.105. Nor should we overlook the fact that formal discovery itself is intended to promote settlement. (See, e.g., *Province* v. *Center for Women's Health & Family Birth* (1993) 20 Cal.App.4th 1673, 1683-1684 [25 Cal.Rptr.2d 667].) Unlimited ex parte disclosure on the part of any doctor who fears he or she "may incur" malpractice liability is unnecessary and inconsistent with the purpose of the Act.

## II

Although I would find that the disclosure plaintiff complains of was not permitted by the Act, nonetheless I would hold that the litigation privilege of section 47, subdivision (b) (hereafter section 47(b)) immunized Dr. Yamaguchi from liability because his disclosures occurred in connection with the ongoing litigation against Dr. Geis.

Section 47(b) immunizes publications "(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 212 [266 Cal.Rptr. 638, 786 P.2d 365].) The privilege is absolute and immunizes persons for liability for all torts. The only exception is in an action for malicious prosecution. (*Id.,* at pp. 215-216.) The privilege also applies to prelitigation communications that have some relation to anticipated lawsuits. (*Rubin* v. *Green* (1993) 4 Cal.4th 1187, 1194 [17 Cal.Rptr.2d 828, 847 P.2d 1044].)

As it is undisputed that the communication at issue here between Dr. Yamaguchi and the insurer had a clear relationship to the lawsuit against Dr. Geis, it seems clear on the face of the matter that the litigation privilege should apply.

The Court of Appeal found otherwise, concluding that conduct, rather than communication, was at issue.

---

[2]The majority's reference to section 56.16 is also unpersuasive. Plaintiff's claim that Dr. Yamaguchi disclosed her present and past medical condition goes far beyond the limited disclosure authorized by that section. If the section authorized the disclosure plaintiff complains of, the restrictions of the rest of the Act would be unenforceable.

It is true that in *Ribas* v. *Clark* (1985) 38 Cal.3d 355 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417] and *Kimmel* v. *Goland* (1990) 51 Cal.3d 202 [271 Cal.Rptr. 191, 793 P.2d 524], we pointed out that when it is noncommunicative conduct, such as eavesdropping or surreptitious taping, rather than communication for the purpose of litigation that causes an injury, the litigation privilege does not apply. In *Ribas* v. *Clark, supra,* 38 Cal.3d 355, an attorney's violation of a statute in taping the conversation between his client and the opposing party caused an injury at the moment it occurred—the injury did not arise from a communication for the purpose of litigation. We concluded that although the taping itself was actionable, the testimonial use of the contents of the overheard conversation was privileged. (*Id.,* at p. 364; see also *Rubin* v. *Green, supra,* 4 Cal.4th at p. 1195.) Similarly, in *Kimmel* v. *Goland, supra,* 51 Cal.3d 202, the conduct of secretly taping a telephone conversation caused an actionable injury that was not related to any publication of the information contained in the telephone conversation. (*Id.,* at p. 209.) We distinguished "injury allegedly arising from communicative acts . . . and injury resulting from noncommunicative conduct, i.e., the invasion of privacy resulting from the attorney's eavesdropping." (*Id.,* at p. 211.) Thus we carefully distinguished immunized communicative acts related to litigation and injuries arising from illegal conduct unrelated to any judicial proceeding.

We recently made this distinction even more clearly in *Rubin* v. *Green, supra,* 4 Cal.4th 1187. There we held that an attorney's solicitation of business in possible violation of the Business and Professions Code was essentially communicative, and therefore privileged under section 47(b). That the defendant's communication necessarily also involved related conduct did not destroy the privilege. (4 Cal.4th at p. 1195.) We held that "plaintiff's claims, however styled, are founded essentially upon alleged misrepresentations made by the law firm (and Green) to [park residents] in the course of discussions over park conditions and the possibility of being retained to prosecute the failure-to-maintain action, and the subsequent filing of pleadings in the lawsuit itself. Whether these acts amounted to wrongful attorney solicitation or not, they were communicative in their essential nature and therefore within the privilege of section 47(b)." (*Id.,* at p. 1196.)

Thus the defendant's violation of the Act in this case, like the possible violation of the Business and Professions Code in *Rubin* v. *Green, supra,* 4 Cal.4th 1187, does not by itself strip him of the protection of the litigation privilege. The relevant question is not whether defendant violated a statute, but whether defendant injured plaintiff through conduct or through communication.

It cannot be gainsaid that plaintiff alleges in her seventh, eighth and twelfth causes of action that Dr. Yamaguchi injured her because he "disclosed . . . confidential medical information" to Norcal. The general allegations of her complaint allege that Dr. Yamaguchi disclosed the information for the purpose of aiding the defense of the ongoing litigation against Dr. Geis. It follows that her complaint arises from a communication connected with litigation, one that our case law clearly establishes is immunized by section 47(b).

## III

Plaintiff has alleged that defendant's disclosure of confidential information about her medical condition was a violation of her constitutional right to privacy under article I, section 1 of the California Constitution. I would conclude that because it was foreseeable that the disclosure was within established limits of the litigation privilege, plaintiff cannot make out a claim for violation of privacy under the majority opinion in *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 [26 Cal.Rptr.2d 834, 865 P.2d 633] (*Hill*).

In *Hill, supra,* 7 Cal.4th 1, we held that "a plaintiff alleging an invasion of privacy in violation of the state constitutional right to privacy must establish each of the following: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." (*Id.,* at pp. 39-40.) Although I disagree with this standard (*id.,* at p. 73 et seq. (dis. opn. of Mosk, J.)), it is the law.

A plaintiff who brings a malpractice action has a limited expectation of privacy in his or her medical records. Although I would find the particular disclosure inappropriate under the Act, a plaintiff bringing such an action is required to make substantial disclosures regarding medical history during formal and informal discovery. (§§ 56.10, subd. (b), 56.105.) The patient, in fact, may not be able to assert the physician-patient privilege as to matters put in issue by the allegations of the complaint. (Evid. Code, § 996; see, e.g., *People* v. *Mickle* (1991) 54 Cal.3d 140, 189 [284 Cal.Rptr. 511, 814 P.2d 290]; see also *In re Lifschutz* (1970) 2 Cal.3d 415 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1].) Indeed, a patient's treating physician who, like Dr. Yamaguchi, is not the subject of a lawsuit, may testify on behalf of the defense in a malpractice action against another doctor. (See *Torres* v. *Superior Court* (1990) 221 Cal.App.3d 181, 186-188 [270 Cal.Rptr. 401]; see also *Province* v. *Center for Women's Health & Family Birth, supra.* 20 Cal.App.4th 1673, 1685.) Accordingly, plaintiff had a relatively lir .ted

privacy interest in information regarding her "current and past medical condition" during treatment for the condition caused by Dr. Geis's negligence.

Finally, defendant's disclosures do not represent the serious invasion of privacy that we said should be actionable in *Hill, supra,* 7 Cal.4th 1. Rather, defendant's disclosures, though painful as far as plaintiff was concerned, actually may have served another right of constitutional magnitude, that is, the right of free access to the courts. (See *Pacific Gas & Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1133 [270 Cal.Rptr. 1, 791 P.2d 587].) As we said in *Rubin* v. *Green, supra,* 4 Cal.4th 1187, "[u]ndergirding the immunity conferred by section 47(b) is the broadly applicable policy of assuring litigants 'the utmost freedom of access to the courts to secure and *defend* their rights . . . .' " (*Id.,* at p. 1194, italics added.)

Accordingly, I would conclude that plaintiff has failed to make out a claim for violation of the constitutional right to privacy under article I, section 1 of the California Constitution.

## IV

I dissent from the conclusion of the majority that plaintiff failed to state a cause of action for violation of section 56 et seq. I concur, however, in the disposition of the majority because I would find the claim barred by the litigation privilege, and I would find no violation of constitutional rights under *Hill, supra,* 7 Cal.4th 1.

**KENNARD, J.,** Concurring and Dissenting.—I agree with the majority that a doctor does not violate the Confidentiality of Medical Information Act (Civ. Code, § 56 et seq.) by releasing a patient's medical information to a lawyer or insurer defending another doctor against whom the patient has asserted a claim for medical malpractice. And I agree with Justice Mosk that when a lawyer or insurer interviews a doctor to gather information for use in defending a claim of medical malpractice, the conduct of all participants in the interview is protected by the litigation privilege (Civ. Code, § 47, subd. (b)).

But I part company with the majority and with Justice Mosk when it comes to the right of privacy guaranteed by our state Constitution. Although it is true that by asserting a medical malpractice claim a patient relinquishes the right of privacy as to matters directly relevant to the claim and essential to its fair resolution, the patient retains in full the right of privacy as to all confidential information not meeting this strict test of legal relevance.

Because the complaint here alleges that plaintiff's doctor revealed matters that are unlikely to have direct relevance to her malpractice claim, and because the litigation privilege does not bar a constitutional right of action, plaintiff should be permitted to go forward with her cause of action for violation of the constitutional right of privacy.

Finally, I do not join the majority to the extent it may appear to give unqualified approval to ex parte interviews[1] of a medical malpractice plaintiff's doctor, without the knowledge or consent of the plaintiff or the plaintiff's counsel. The propriety of this practice has sharply divided this country's appellate courts, and I would leave this matter open for resolution in a proper case.

## I. FACTS

Dr. Geis treated plaintiff Doris Heller for an infection in one finger. Despite Geis's treatment, the infection worsened to the point that it became necessary to amputate the finger. Geis and Dr. Yamaguchi performed the amputation, which occurred in two stages. After the amputation, plaintiff developed reflex sympathetic dystrophy, which is characterized by burning pain and swelling. Yamaguchi treated plaintiff for this condition.

While plaintiff was under the care of Dr. Yamaguchi, she commenced suit against Dr. Geis for malpractice in the diagnosis and treatment of the original infection. During the course of this lawsuit, Yamaguchi was deposed and he revealed that a representative of Norcal Mutual Insurance Company (the professional liability insurer of both Geis and Yamaguchi; hereafter Norcal) and the lawyer who was representing Geis had interviewed Yamaguchi on several occasions. Following this revelation, plaintiff settled her action against Geis and commenced this action against Yamaguchi, Norcal, and others.

In the complaint at issue here (plaintiff's fourth amended complaint), plaintiff has alleged that Norcal and Dr. Yamaguchi "conspired and agreed to obtain and release private, intimate, personal, financial, and confidential medical information and records without the consent or knowledge of [plaintiff] or her attorney." Plaintiff further alleges that this information and these records were "obtained and provided to Norcal in order to obtain an economic advantage over [plaintiff] in her suit against Dr. Geis . . . ."

---

[1]"Ex parte" has been defined as "On one side only; by or for one party; done for, in behalf of, or on the application of, one party only." (Black's Law Dict. (5th ed. 1979) p. 517.) As used here, an "ex parte interview" is an interview conducted by one party litigant in the absence of other party litigants.

Plaintiff's complaint attempts to state claims for medical negligence (against Yamaguchi), negligent infliction of emotional distress (against Yamaguchi and Norcal), intentional infliction of emotional distress (against Yamaguchi and Norcal), intentional interference with the doctor-patient relationship (against Norcal), violation of the Confidentiality of Medical Information Act (against Yamaguchi), unfair business practices (against Norcal and Yamaguchi), concealment (against Norcal and Yamaguchi), and violation of the constitutional right of privacy (against Norcal and Yamaguchi).

Yamaguchi and Norcal each challenged plaintiff's complaint by demurrer. The trial court sustained Norcal's demurrer without leave to amend as to each of plaintiff's claims against Norcal, and it granted a judgment dismissing Norcal from the action. As for Yamaguchi, the trial court overruled his demurrer to the cause of action for medical negligence, and it sustained without leave to amend Yamaguchi's demurrer to each of the other causes of action. Plaintiff appealed from the judgment of dismissal in favor of Norcal, and she petitioned the Court of Appeal for a writ of mandate to overturn the trial court's ruling barring each of her claims against Yamaguchi except the claim for medical negligence.

The Court of Appeal issued an order to show cause on plaintiff's mandate petition, and it consolidated that proceeding with the appeal from the judgment of dismissal in favor of Norcal. In its opinion in these consolidated proceedings, the Court of Appeal held that the litigation privilege (Civ. Code, § 47, subd. (b)) operated to bar plaintiff's claims against Norcal and Yamaguchi for negligent and intentional infliction of emotional distress, interference with the doctor-patient relationship, unfair business practices, and concealment. The Court of Appeal concluded that the litigation privilege did not apply to plaintiff's claims for violation of the Confidentiality of Medical Information Act and violation of the constitutional right of privacy, and that the pleading of these claims was adequate to withstand demurrer. This court granted petitions for review by Norcal and Yamaguchi.

## II. THE CONFIDENTIALITY OF MEDICAL INFORMATION ACT

In simple language, the Confidentiality of Medical Information Act (Civ. Code, § 56 et seq.) states: "No provider of health care shall disclose medical information regarding a patient of the provider without first obtaining an authorization . . . ." (Civ. Code, § 56.10, subd. (a).) This core provision is followed by a long list of exceptions, couched in language that is anything but simple.

At issue here is this exception: "A provider of health care may disclose medical information . . . [¶] . . . to organized committees and agents of

professional societies or of medical staffs of licensed hospitals, or to licensed health care service plans, or to professional standards review organizations, or to utilization and quality control peer review organizations as established by Congress in Public Law 97-248 in 1982, or to persons or organizations insuring, responsible for, or defending professional liability which a provider may incur, if the committees, agents, plans, organizations, or persons are engaged in reviewing the competence or qualifications of health care professionals or in reviewing health care services with respect to medical necessity, level of care, quality of care, or justification of charges." (Civ. Code, § 56.10, subd. (c)(4).)

This language, dense and opaque on first reading, appears on closer examination to fit the situation alleged in this case, in which a doctor (Yamaguchi) released to a representative of a professional liability carrier (Norcal), and to an attorney, medical information about a patient (plaintiff) who had asserted a claim of medical malpractice against another doctor (Geis) who was the carrier's insured and the attorney's client. To evaluate plaintiff's claim for settlement purposes, and to prepare a defense in the event of trial, Norcal and Geis's lawyer of necessity had to determine whether the professional services that Geis had supplied to plaintiff measured up to the prevailing standard of care. To make that determination, they sought and obtained medical information in Yamaguchi's possession. Isolating the relevant statutory language, it appears that a doctor or other provider of health services may disclose medical information "to persons or organizations insuring, responsible for, or defending professional liability which a provider may incur, if the . . . organizations, or persons are engaged . . . in reviewing health care services with respect to . . . quality of care . . . ." (Civ. Code, § 56.10, subd. (c)(4).) That is precisely the situation alleged here. Accordingly, I agree with the majority that plaintiff has not stated a claim for violation of the Confidentiality of Medical Information Act.

I hasten to add two observations. First, the exception at issue here is permissive, not mandatory. When a patient has asserted a malpractice claim against one doctor, another doctor treating the same patient "may" disclose medical information to the insurer or attorney representing the accused doctor. (Civ. Code, § 56.10, subd. (c)(4).) But in this situation the Confidentiality of Medical Information Act imposes no obligation on the doctor to disclose the medical information without the patient's consent.

Second, the statute says nothing about the circumstances under which the authorized disclosure of confidential medical information is to take place. Thus, the statute does not purport to answer the question whether such disclosure should be permitted to occur in secret, without prior notice to the

patient. As I explain below, appellate courts throughout the nation have hotly debated this question, and this court should not attempt to resolve it in this case.

## III. The Litigation Privilege

Because it promotes the finality of judgments, encourages open channels of communication in judicial proceedings, and allows attorneys to zealously protect their clients' interests without fear of retribution by opposing litigants, the litigation privilege of Civil Code section 47, subdivision (b), has been given broad scope. (*Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 213-214 [266 Cal.Rptr. 638, 786 P.2d 365].) Thus, the privilege is absolute and immunizes the communications of parties, attorneys, and potential witnesses from tort liability on a wide variety of both common law and statutory theories, with the sole exceptions being liability for malicious prosecution (*id.* at pp. 215-216; see also *Rubin* v. *Green* (1993) 4 Cal.4th 1187 [17 Cal.Rptr.2d 828, 847 P.2d 1044]) and liabilities directly established by constitutional command. Here, the ex parte interview was a communication in the course of litigation and thus within the litigation privilege's zone of protection against all of plaintiff's causes of action, save only the claim for invasion of the constitutional right of privacy. (See *Moses* v. *McWilliams* (1988) 379 Pa.Super. 150 [549 A.2d 950].)

## IV. The Constitutional Right of Privacy

The California Constitution declares that "All people are by nature free and independent and have inalienable rights," and that among these inalienable rights are "obtaining safety, happiness, and privacy." (Cal. Const., art. I, § 1.)

In *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 [26 Cal.Rptr.2d 834, 865 P.2d 633], this court held that the privacy clause of the state Constitution "creates a right of action against private as well as government entities." (*Hill* v. *National Collegiate Athletic Assn., supra,* at p. 20.) We further held that the elements of a claim for violation of the constitutional privacy right are: "(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." (*Id.* at pp. 39-40.)

Here, both the majority and Justice Mosk conclude that plaintiff's complaint is defective as to the second element—the reasonable expectation of privacy. They note that by bringing a malpractice action against Dr. Geis, plaintiff opened her medical history to discovery as to matters put in issue by the allegations against Geis.

This is all true as far as it goes, but it does not defeat plaintiff's claim for violation of privacy. Plaintiff sued Dr. Geis for professional negligence in diagnosing and treating an infection of her finger. Any medical information in the possession of Dr. Yamaguchi bearing on the issues of the existence of the alleged negligence or the extent of damages resulting from the alleged negligence would be directly relevant to the issues in the Geis litigation. As to any such information, plaintiff could have no reasonable expectation of privacy after asserting her malpractice claim. But she preserved her reasonable expectation of privacy as to any other information she imparted to Yamaguchi in confidence in the course of their doctor-patient relationship.

As this court has observed, "Plaintiff is not compelled, as a condition to entering the courtroom, to discard entirely her mantle of privacy." (*Vinson* v. *Superior Court* (1987) 43 Cal.3d 833, 841-842 [239 Cal.Rptr. 292, 740 P.2d 404].) Although the filing of a lawsuit may be deemed a waiver of privacy as to matters embraced by the action, we have emphasized that the scope of this waiver "must be narrowly rather than expansively construed." (*Britt* v. *Superior Court* (1978) 20 Cal.3d 844, 859 [143 Cal.Rptr. 695, 574 P.2d 766]; accord, *Vinson* v. *Superior Court*, *supra*, at p. 842.) Matters that would otherwise be protected by the constitutional privacy right are discoverable only if "directly relevant to the plaintiff's claim and essential to the fair resolution of the lawsuit." (*Vinson* v. *Superior Court*, *supra*, at p. 842.) The party seeking access to constitutionally protected information has the burden of proving direct relevance. (*Davis* v. *Superior Court* (1992) 7 Cal.App.4th 1008, 1017 [9 Cal.Rptr.2d 331].)

For example, the Court of Appeal has held that a plaintiff who seeks damages for personal injuries, including pain and suffering, does not thereby surrender the right to privacy in postinjury psychotherapeutic records. (*Davis* v. *Superior Court*, *supra*, 7 Cal.App.4th 1008, 1017.) The court summarized its conclusion this way: "By limiting her claim for emotional distress to pain and suffering associated with stated physical injuries, and by explaining that the [Cedar Women's Center] provided no treatment in connection with the injuries for which compensation was sought, petitioner established that it is not reasonably probable that the records are directly relevant to the condition she placed in issue." (*Ibid.*)

This court reached essentially the same conclusion when construing the scope of the patient-litigant exception to the doctor-patient privilege (Evid. Code, § 996). As the Courts of Appeal have recognized, the doctor-patient privilege and the right of privacy are "closely related protections against public disclosure of private information." (*Binder* v. *Superior Court* (1987) 196 Cal.App.3d 893, 899 [242 Cal.Rptr. 231]; accord, *Davis* v. *Superior Court*, *supra*, 7 Cal.App.4th 1008, 1013.)

In this state, the doctor-patient privilege protects "information, including information obtained by an examination of the patient, transmitted between a patient and his physician in the course of that relationship and in confidence by a means which, so far as the patient is aware, discloses the information to no third persons other than those who are present to further the interest of the patient in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the physician is consulted, and includes a diagnosis made and the advice given by the physician in the course of that relationship." (Evid. Code, § 992.) Under the patient-litigant exception, there is no doctor-patient privilege "as to a communication relevant to an issue concerning the patient if such issue has been tendered by" the patient or any party claiming through the patient. (Evid. Code, § 996.)

In *Britt* v. *Superior Court, supra,* 20 Cal.3d 844, owners and residents of homes near an airport brought suit against the owner of the airport seeking, among other things, damages for personal injuries and emotional disturbance caused by the noise, vibrations, air pollution, and smoke produced by operation of the airport. During discovery, the airport owner served the plaintiffs with interrogatories demanding a complete account of each plaintiff's lifetime medical history, including any treatment for mental or emotional disturbance. In this court, the airport owner asserted that under the patient-litigant exception, a patient waived the doctor-patient and psychotherapist-patient privileges by instituting a claim for physical or mental injury. As we had done previously (see *In re Lifschutz* (1970) 2 Cal.3d 415, 435 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1]), this court "emphatically rejected such a broad rendition of the statutory exception." (*Britt* v. *Superior Court, supra,* at p. 863.) We concluded that plaintiffs were "entitled to retain the confidentiality of all unrelated medical or psychotherapeutic treatment they may have undergone in the past." (*Id.* at p. 864.)

Here, the complaint alleged, as I previously noted, that Dr. Yamaguchi disclosed to Norcal "private, intimate, personal, financial, and confidential medical information and records without the consent or knowledge of [plaintiff] or her attorney." Because the case comes before us on demurrer, we must assume that the allegations of the complaint are true, and we may not look beyond those allegations to ascertain the facts. To conclude, as the majority and Justice Mosk do, that all of the confidential material Yamaguchi disclosed to Norcal was directly relevant to plaintiff's malpractice claim against Dr. Geis and essential to that claim's fair resolution is sheer speculation, and improbable speculation at that. In particular, it is difficult to conceive how financial information, disclosed in confidence in the course of

the doctor-patient relationship, could have any direct relevance to plaintiff's malpractice claim against Dr. Geis.[2]

The majority asserts in a footnote that any information plaintiff disclosed to Yamaguchi concerning her financial and emotional state would be unrelated to her medical condition and for this reason not protected by the constitutional privacy right. (Maj. opn., *ante*, p. 43, fn. 4.) As authority for this assertion the majority cites only *Kizer* v. *Sulnick* (1988) 202 Cal.App.3d 431, 439 [248 Cal.Rptr. 712], but in that case the court concluded that no doctor-patient relationship had existed. Here, it is undisputed that plaintiff was Dr. Yamaguchi's patient. Consistent with the Evidence Code's definition of confidential information provided in Evidence Code section 992 (that is, all information transmitted between patient and physician in the course of that relationship and in confidence), I would not exclude confidential information about a patient's emotional or financial condition from the reach of the constitutional privacy right merely because it may not have been strictly necessary to the task of diagnosing and treating the patient.

When a patient has disclosed information to a doctor in confidence, in the course of their professional relationship, a requirement that the information be medically relevant before it will qualify for legal protection is, in my view, destructive of the confidence and trust that are essential to a healthy physician-patient relationship, and it is inconsistent with the purposes of the constitutional privacy right. This is because patients generally cannot be expected to know when information is or is not medically relevant. As one court has put it: "Since the layman is unfamiliar with the road to recovery, he cannot sift the circumstances of his life and habits to determine what is information pertinent to his health. As a consequence, he must disclose all information in his consultations with his doctor—even that which is embarrassing, disgraceful or incriminating. To promote full disclosure, the medical profession extends the promise of secrecy . . . ." (*Hammonds* v. *Aetna Casualty & Surety Company* (N.D.Ohio 1965) 243 F.Supp. 793, 801.) Not knowing when information is medically relevant, but advised by this court that only medically relevant information is protected, patients will be inhibited in relating sensitive or potentially embarrassing information to their physicians.

Because the complaint does not show on its face that all the information Dr. Yamaguchi disclosed was directly relevant to the matters at issue in

---

[2]The complaint alleges that Dr. Yamaguchi knew that plaintiff "was under extreme emotional pressure from the suit [against Dr. Geis] and her medical condition, that she was seeing a psychologist to treat her and that her monthly income was due to decrease as a result of a note being paid off." The complaint does not allege that Yamaguchi conveyed this precise information to Norcal, but this allegation illustrates the kind of confidential information, not relevant to plaintiff's claim against Geis, that Yamaguchi may have disclosed to Norcal or to Geis's attorney.

plaintiff's action against Dr. Geis, I would permit plaintiff to proceed on her claim for violation of the constitutional privacy right.

## V. EX PARTE INTERVIEWS WITH LITIGANT'S DOCTOR

Should the law permit a party litigant to privately interview and obtain medical information from the opposing party's doctor without the opposing party's knowledge or consent? Published decisions of federal courts and courts of our sister states have debated this question with great thoroughness and have given conflicting answers. (See generally, Annot., Discovery: Right to Ex Parte Interview with Injured Party's Treating Physician (1986) 50 A.L.R.4th 714.) There is also no shortage of commentary in legal publications. (See, e.g., Woodard, *Shielding the Plaintiff and Physician: The Prohibition of Ex Parte Contacts with a Plaintiff's Treating Physician* (1991) 13 Campbell L.Rev. 233; Corboy, *Ex Parte Contacts Between Plaintiff's Physician and Defense Attorneys: Protecting the Patient-Litigant's Right to a Fair Trial* (1990) 21 Loy. U. Chi. L.J. 1001; Asher, *Ex Parte Interview with Plaintiff's Treating Physicians—The Offensive Use of the Physician-Patient Privilege* (1990) 67 U.Det. L.Rev. 501; Note, *Restricting Ex Parte Interviews with Nonparty Treating Physicians: Crist v. Moffatt* (1990) 69 N.C. L.Rev. 1381; Note, *Defendants' Right to Conduct Ex Parte Interviews with Treating Physicians in Drug or Medical Device Cases* (1989) 73 Minn. L.Rev. 1451.)

The question is not squarely posed here. We must decide in this case whether disclosure of medical information during an interview is an actionable violation of the Confidentiality of Medical Information Act, but a conclusion that the conduct is not actionable under the statute does not mean that courts are powerless to prevent such interviews or to impose conditions. Nevertheless, the majority's rather offhand disapproval of *Torres v. Superior Court* (1990) 221 Cal.App.3d 181 [270 Cal.Rptr. 401] and *Province v. Center for Women's Health & Family Birth* (1993) 20 Cal.App.4th 1673 [25 Cal.Rptr.2d 667] "to the extent [they] could be read to prohibit all ex parte contacts between a physician and his [*sic*] attorneys or insurers" (maj. opn., *ante*, p. 41) makes further discussion necessary.

The relationship of doctor to patient is a fiduciary one. (*Stafford v. Shultz* (1954) 42 Cal.2d 767, 777 [270 P.2d 1].) A doctor has not only a legal obligation, grounded in the doctor-patient privilege (Evid. Code, § 994) and the constitutional right of privacy (Cal. Const., art. I, § 1), but also a professional obligation to maintain the secrecy of patient confidences. (See Bus. & Prof. Code, § 2263 ["willful, unauthorized violation of professional confidence constitutes unprofessional conduct"].) The Judicial Council of the American Medical Association puts it this way: "The information disclosed to a physician during the course of the relationship between physician

and patient is confidential to the greatest possible degree. The patient should feel free to make a full disclosure of information to the physician in order that the physician may most effectively provide needed services. The patient should be able to make this disclosure with the knowledge that the physician will respect the confidential nature of the communication. The physician should not reveal confidential communications or information without the express consent of the patient, unless required to do so by law." (Current Opinions of the Council on Ethics and Judicial Affairs of the American Medical Association (1986) § 5.05, p. 21.)

As we have seen, a patient makes a limited waiver of the doctor-patient privilege by bringing an action for personal injury or medical malpractice. During the course of such litigation, the defendants have a right to discover any information in the possession of the plaintiff's treating physicians that is directly relevant to matters at issue and essential to their fair resolution. Thus, the question is not whether relevant information must be disclosed, but the method of such disclosure. (See *Manion* v. *N.P.W. Medical Center* (M.D.Pa. 1987) 676 F.Supp. 585, 593 [". . . the prohibition against unauthorized *ex parte* contacts . . . affects defense counsel's methods, not the substance of what is discoverable"].)

Some courts see no reason to bar or restrict defense counsel from conducting ex parte interviews of the plaintiff's treating physicians (e.g., *Lewis* v. *Roderick* (R.I. 1992) 617 A.2d 119; *Domako* v. *Rowe* (1991) 438 Mich. 347, 360 [475 N.W.2d 30, 36]; *Felder* v. *Wyman* (D.S.C. 1991) 139 F.R.D. 85; *Coralluzzo* v. *Fass* (Fla. 1984) 450 So.2d 858; *Doe* v. *Eli Lilly & Co.* (D.D.C. 1983) 99 F.R.D. 126; *Trans-World Investments* v. *Drobny* (Alaska 1976) 554 P.2d 1148, 1152), and, in fact, have directed plaintiffs to execute authorization forms to facilitate the interviews. These courts emphasize, as does the majority here, that private interviews save time and money when compared to more formal methods of discovery (*Domako* v. *Rowe, supra,* 438 Mich. at p. 361; *Doe* v. *Eli Lilly & Co., supra,* at p. 128), and that the information disclosed in the ex parte interviews would be disclosed eventually anyway. They also maintain that private interviews are "conducive to spontaneity and candor in a way depositions can never be" (*Doe* v. *Eli Lilly & Co., supra,* at p. 128) and that they speed the settlement process by encouraging early investigation and evaluation of claims (*Trans-World Investments* v. *Drobny, supra,* 544 P.2d at p. 1152; *Domako* v. *Rowe, supra,* 438 Mich. at p. 361).

Taking a contrary position, other courts have held that in medical malpractice or personal injury litigation, defense counsel should never be permitted to interview a plaintiff's nonparty treating physician ex parte without

the plaintiff's consent. (*State* ex rel. *Kitzmiller* v. *Henning* (1993) 190 W.Va. 142 [437 S.E.2d 452]; *Cua* v. *Morrison* (Ind. 1994) 636 N.E.2d 1248, adopting opn. published at (Ind.Ct.App. 1993) 626 N.E.2d 581; *Crist* v. *Moffatt* (1990) 326 N.C. 326, 332 [389 S.E.2d 41, 45]; *Duquette* v. *Superior Court* (1989) 161 Ariz. 269 [778 P.2d 634]; *Loudon* v. *Mhyre* (1988) 110 Wn.2d 675 [756 P.2d 138]; *Linton* v. *City of Great Falls* (1988) 230 Mont. 122 [749 P.2d 55]; *Petrillo* v. *Syntex Laboratories, Inc.* (1987) 148 Ill.App.3d 581, 591 [102 Ill.Dec. 172, 499 N.E.2d 952]; *Nelson* v. *Lewis* (1987) 130 N.H. 106 [534 A.2d 720]; *Smith* v. *Ashby* (1987) 106 N.M. 358 [743 P.2d 114]; *Roosevelt Hotel Ltd. Partnership* v. *Sweeney* (Iowa 1986) 394 N.W.2d 353; *Weaver* v. *Mann* (D.N.D. 1981) 90 F.R.D. 443, 445; *Anker* v. *Brodnitz* (1979) 98 Misc.2d 148, [413 N.Y.S.2d 582]; *Wenninger* v. *Muesing* (1976) 307 Minn. 405 [240 N.W.2d 333]; *Fields* v. *McNamara* (1975) 189 Colo. 284 [540 P.2d 327]; *Hammonds* v. *Aetna Casualty & Surety Company, supra,* 243 F.Supp. 793.)[3]

These courts point out that the spontaneity and candor that is one of the claimed virtues of informal interviews is also its principal vice. In the relaxed atmosphere of a private interview, a nonparty treating physician may be led to disclose confidential information not relevant to the litigation and therefore protected by the doctor-patient privilege and the doctor's professional obligation to preserve confidentiality.[4] (See, e.g., *Karsten* v. *McCray* (1987) 157 Ill.App.3d 1, 14 [109 Ill.Dec. 364, 509 N.E.2d 1376, 1384]; *Wenninger* v. *Muesing, supra,* 307 Minn. 405, 410-411 [240 N.W.2d 333, 336-337]; *Manion* v. *N.P.W. Medical Center, supra,* 676 F.Supp. 585, 594.)

The very possibility of unauthorized disclosure, these courts maintain, is destructive of the trust essential to a secure and productive doctor-patient

---

[3]The Missouri Supreme Court has held that a plaintiff in a personal injury action may not be compelled to authorize defense counsel to meet ex parte with the plaintiff's treating physicians. (*State* ex rel. *Woytus* v. *Ryan* (Mo. 1989) 776 S.W.2d 389, 395.) If the treating physician meets with defense counsel without the plaintiff's consent and reveals confidential information not relevant to the personal injury action, the plaintiff may sue the physician for damages resulting from the unauthorized disclosure. (*Brandt* v. *Medical Defense Associates* (Mo. 1993) 856 S.W.2d 667, 670.) In the underlying personal injury action, however, the defense is free to use any evidence developed by the interview; the plaintiff has no sanction or remedy available. (*Brandt* v. *Pelican* (Mo. 1993) 856 S.W.2d 658, 662.)

[4]The following comment is typical: "The possibility of inadvertent wrongful disclosure of confidential matters troubles us. We do not mean to question the integrity of doctors and lawyers or to suggest that we must control discovery in order to assure their ethical conduct. We are concerned, however, with the difficulty of determining whether a particular piece of information is relevant to the claim being litigated. Placing the burden of determining relevancy on an attorney, who does not know the nature of the confidential disclosure about to be elicited, is risky. Asking the physician, untrained in the law, to assume this burden is a greater gamble and is unfair to the physician. We believe this determination is better made in a setting in which counsel for each party is present and the court is available to settle disputes." (*Roosevelt Hotel Ltd. Partnership* v. *Sweeney, supra,* 394 N.W.2d 353, 357.)

relationship: "The presence of the patient's counsel at the doctor's interrogation permits the patient to know what his doctor's testimony is, allays a patient's fears that his doctor may be disclosing personal confidences, and thus helps preserve the complete trust between doctor and patient which is essential to the successful treatment of the patient's condition." (*Wenninger* v. *Muesing, supra,* 307 Minn. 405, 411 [240 N.W.2d 333, 337]; accord, *Manion* v. *N.P.W. Medical Center, supra,* 676 F.Supp. 585, 594; *Loudon* v. *Mhyre, supra,* 110 Wn.2d 675, 679 [756 P.2d 138, 141].)

In medical malpractice actions, moreover, defense counsel may use an ex parte interview with the plaintiff's doctor to solicit sympathy for the defendant, and thereby compromise the doctor's loyalty to the patient: "An unauthorized ex parte interview could disintegrate into a discussion of the impact of a jury's award upon a physician's professional reputation, the rising cost of malpractice insurance premiums, the notion that the treating physician might be the next person to be sued, and other topics which might influence the treating physician's views. The potential for impropriety grows even larger when defense counsel represents the treating physician's own insurance carrier . . . ." (*Manion* v. *N.P.W. Medical Center, supra,* 676 F.Supp. 585, 594-595; see also *Duquette* v. *Superior Court, supra,* 161 Ariz. 269, 276 [778 P.2d 634, 641]; *Anker* v. *Brodnitz, supra,* 98 Misc.2d 148, 153 [413 N.Y.S.2d 582, 585].)

The New Jersey Supreme Court has articulated a middle ground, in an attempt to reconcile the competing interests. In *Stempler* v. *Speidell* (1985) 100 N.J. 368 [495 A.2d 857, 50 A.L.R.4th 699], the court crafted a rule under which plaintiffs may be required to authorize their treating physicians to hold ex parte interviews with attorneys for the defendants, but on the condition that the defense lawyers provide the plaintiff's lawyers with reasonable notice of the time and place of the interviews, a description of the anticipated scope of the interviews, and assurances that the physicians will be advised that their participation is entirely voluntary. The aim of the procedure is to provide plaintiffs' lawyers with an opportunity to advise the doctors in advance of "any appropriate concerns as to the proper scope of the interview, and the extent to which plaintiff continues to assert the patient-physician privilege with respect to that physician." (*Id.* at p. 382 [495 A.2d at p. 864].) The court recognized that in particular cases these safeguards might not be adequate: "Plaintiff may also seek and obtain a protective order if under the circumstances a proposed *ex parte* interview with a specific physician threatens to cause such substantial prejudice to plaintiff as to warrant the supervision of the trial court. Such supervision could take the form of an order requiring the presence of plaintiff's counsel during the interview or, in extreme cases, requiring defendant's counsel to proceed by deposition." (*Id.* at p. 383 [495 A.2d at pp. 864-865].)

The majority does not suggest that a court could order a plaintiff to authorize defense counsel to interview the plaintiff's treating physicians ex parte. Absent such authorization, I would expect that few defense counsel would attempt to interview a plaintiff's treating physician and few physicians would consent to be interviewed.[5] As I understand it, the majority holds only that if an ex parte interview does occur without the plaintiff's knowledge or consent, the physician does not thereby violate the Confidentiality of Medical Information Act and that Norcal's ex parte interviews of Yamaguchi are not actionable under the facts of this case. Given this limited holding, issues concerning the propriety of ex parte interviews of nonparty treating physicians are certain to reach this court again. As has occurred in other states, such issues may arise when a plaintiff, invoking a trial court's inherent authority to supervise discovery, moves for a protective order to bar or restrict ex parte interviews, or when a plaintiff moves at trial to exclude information disclosed during such interviews. When these issues return, in this or some other manner, I would hope that this court gives them the thorough consideration and analysis they deserve.

## CONCLUSION

"The right of privacy has no more conspicuous place than in the physician-patient relationship, unless it be in the priest-penitent relationship." (*Doe* v. *Bolton* (1973) 410 U.S. 179, 219 [35 L.Ed.2d 201, 191, 93 S.Ct. 739] (conc. opn. of Douglas, J.).) For violation of that privacy right, our state Constitution provides a remedy by means of an action for damages. Here, plaintiff's complaint alleges that her treating physician, Yamaguchi, engaged in wide-ranging ex parte discussions that may have disclosed intimate matters not relevant to plaintiff's pending malpractice action. I would hold that plaintiff has stated a claim under our state Constitution for violation of her right of privacy.

---

[5] I assume that most defense counsel will follow the advice of a leading treatise on the law of medical malpractice: "[W]here there is no clear statute or rule permitting otherwise, defense counsel should confer with non-party physicians who treated plaintiff only with the knowledge and consent of the plaintiff and counsel. Not only is that the fair way, it avoids any implication of collusion or conspiracy which may appear from clandestine consultations. To the same end, plaintiff's counsel should cooperate in voluntarily facilitating this aspect of the defense attorney's job." (1 Louisell & Williams, Medical Malpractice (1993) § 12.05, p. 12-12.)