[No. B157421. Second Dist., Div. Four. June 25, 2003.]

EUFAULA GARRETT, Plaintiff and Appellant, v.
WILLIAM YOUNG, Defendant and Respondent.

**COUNSEL**

Law Offices of Alvin L. Pittman and Alvin L. Pittman for Plaintiff and Appellant.

Reback, McAndrews & Kjar, Robert C. Reback and David J. Rubaum for Defendant and Respondent.

**OPINION**

**CURRY, J.**—Appellant Eufaula Garrett seeks to overturn a judgment on a directed verdict in favor of respondent William Young, M.D. Appellant brought a lawsuit against respondent for, among other things, invasion of privacy and violation of the Confidentiality of Medical Information Act (Civ. Code, § 56 et. seq., CMIA). The primary issue presented is whether the trial court properly interpreted section 56.16 of the Civil Code,[1] an exception to the CMIA's general rule prohibiting disclosure of medical information to outsiders. The court ruled that section 56.16 permits health care providers such as respondent to discuss general medical information about a patient without his or her consent, and that the information disclosed by respondent

---

[1]Unless otherwise indicated, all statutory references herein are to the Civil Code.

to appellant's employer was of a sufficiently nonspecific nature to fit within the exception. The court further ruled that under the evidence presented, appellant could not maintain a nonstatutory action for invasion of privacy. We affirm.

## Factual and Procedural Background

*The Complaint*

The complaint alleged that in March 1999, appellant sought medical treatment from respondent for symptoms she felt were being caused by the conditions at her job, and that respondent disclosed "personal and confidential medical information about [appellant], including but not limited to [appellant's] current health, symtomology [*sic*], examinations performed, and her planned visits with [respondent] and other health care providers" to appellant's supervisor at work, Kenneth Lombard. Lombard allegedly used this information to support his termination of appellant's employment and disclosed the information to other parties.

*The Trial*

After an unsuccessful motion for summary judgment,[2] the matter proceeded to trial. Respondent was called as the first witness by appellant. He testified that appellant became his patient as the result of a request from Lombard, who had been respondent's patient for 10 to 15 years. Appellant was suffering from a rash, and Lombard thought appellant was possibly experiencing an allergic reaction from a plant in her office. Appellant returned to see respondent on several occasions, including October 26, 1998, March 17, 1999, March 19, 1999, and March 29, 1999. Besides the rash and related itchiness, appellant suffered from sleeplessness and weight loss, and complained of stress. Respondent eventually referred appellant to a psychiatrist under the diagnosis of "severe depression" although he believed a more accurate diagnosis was "anxiety." His office sent return-to-work documents to her employer at the end of March 1999, stating that appellant was under their care for "specific medical reasons."

Respondent admitted discussing appellant with Lombard. Lombard had called to ask how appellant was doing. Respondent told him that she was

---

[2]Respondent moved for summary judgment under section 56.10, subdivision (c)(8)(B), which permits a health care provider or service plan "that has created medical information as a result of employment-related health care services to an employee conducted at the specific prior written request and expense of the employer" to disclose to that employer the employee's information that "[d]escribes functional limitations of the patient that may entitle the patient to leave from work for medical reasons . . . ." The court denied the motion, stating that there was no evidence that appellant consulted with respondent at the request of her employer or that the visit was paid for by her employer.

suffering from itching and stress. Respondent "probably" also told Lombard that appellant was not able to return to work at that time. He did not tell Lombard about the psychiatric referral. In response to a question by Lombard about a CAT scan or ultrasound, respondent said he knew nothing about any additional diagnostic tests.

During his testimony, respondent said that "[s]tress is not a diagnosis" and that he was "careful . . . not to divulge any information regarding [appellant's] specific medical problems" and "said to [Lombard] nothing that was not 100 percent obvious . . . to anybody who would have seen [appellant]." After hearing this testimony, the court called counsel into chambers to discuss whether appellant would need an expert witness on the question of whether stress and itching were medical conditions that could not be discussed with third parties under the CMIA. The court decided to avoid making a final decision until after appellant concluded her case and the parties had an opportunity to brief the issue.

Appellant was the only other witness called. She testified that she began working for Magic Johnson Theatres in September 1997 as director of marketing. In her 1998 annual review, she was recommended for promotion. Shortly thereafter, she complained that Lombard was harassing her and treating her unfairly. At around that same time, she began seeing respondent due to experiencing itching, stomach cramping, sleeplessness, and weight loss. Respondent asked whether there were any stress factors in her life, and appellant told him work was causing her stress. Respondent recommended that she speak to Lombard, but appellant told respondent that Lombard was part of the problem and that she really did not want her problems discussed with him at all. She asked respondent not to have any telephonic conversations with her employer.

Appellant later heard from respondent's receptionist that he had spoken to appellant's employer. Appellant spoke to respondent, who became defensive and belligerent and refused to directly answer her question about whether the report she heard was true.

Subsequent to her conversation with respondent's receptionist, appellant went into Lombard's office and saw a document on his assistant's desk with her (appellant's) name on it and the date March 31, 1999. The document appeared to be a dismissal or termination notice. One of the bullet points stated: "3/26/99 - Spoke to [respondent] regarding [appellant's] condition. He stated she is under a fairly amount [sic] of stress and has itching. Other than that there were no other serious symptoms and did not talk to her regarding ordering any test." The document also referred to a conversation

Lombard had with appellant in which she had told Lombard she was going to undergo a CAT scan and ultrasound. The document listed numerous absences from work on appellant's part during February and March 1999 due to illness and doctor's appointments.[3] At the time, appellant was seeing two other doctors, one of whom had recommended an ultrasound.

Reading the termination document caused appellant to immediately submit a letter of resignation to the Magic Johnson Theatres in which she stated that the working conditions were unbearable and that she could no longer endure the harassment.

In her testimony, appellant admitted that her rash and itchiness were plainly visible but denied telling her employer or her coworkers that she had job-related stress. Instead, she said she had complained that the environment was unfair, abusive, and sexist, and that unfair demands were made on employees, invasive of their personal time. This contradicted deposition testimony in which she said that she had complained about "job-related stress" to numerous coworkers beginning in late 1998.

Appellant testified that respondent's actions caused her to feel shock, fear, and emotional pain. The experience led her to lose trust in doctors and specifically caused her to cease the psychiatric treatment she was undergoing at the time.

*The Directed Verdict*

After the conclusion of appellant's testimony, the trial court held a hearing on whether to grant a directed verdict. The court ruled that respondent was entitled to a directed verdict because section 56.16 allows a physician to reveal general information about a patient with impunity. Since the information could lawfully be revealed under the CMIA, the court ruled there was no legally protected privacy interest or reasonable expectation of privacy. This appeal followed.

---

[3]The exhibits included a return-to-work authorization from a gynecologist dated February 16, 1999, stating that appellant could resume her normal activities on or about February 22; a return-to-work authorization from a different gynecologist dated February 24, 1999, stating that appellant could return to work on March 1; and two return-to-work authorizations from respondent's office, one dated March 29, 1999, stating that she would be "disabled" until March 30, and another dated March 30, 1999, stating that she would be "disabled" between March 27 and April 2.

## DISCUSSION

### I

Section 56.10 states that no provider of health care is to disclose medical information regarding a patient without first obtaining an authorization, except under certain circumstances enumerated in the provision.[4] Under section 56.35, "In addition to any other remedies available at law, a patient whose medical information has been used or disclosed in violation of Section 56.10 . . . and who has sustained economic loss or personal injury therefrom may recover compensatory damages, punitive damages not to exceed three thousand dollars ($3,000), attorneys' fees not to exceed one thousand dollars ($1,000), and the costs of litigation."

Section 56.16 contains a separate exception to the general rule of nondisclosure. It provides in pertinent part: "Unless there is a specific written request by the patient to the contrary, nothing in this part shall be construed to prevent a provider, upon an inquiry concerning a specific patient, from releasing at its discretion any of the following information: the patient's name, address, age, and sex; a general description of the reason for treatment (whether an injury, a burn, poisoning, or some unrelated condition); the general nature of the injury, burn, poisoning, or other condition; the general condition of the patient; and any information that is not medical information as defined in subdivision (c) of Section 56.05."[5]

To understand this provision, we begin by reviewing the background of the statute. The CMIA was originally enacted in 1979 as Senate Bill No. 480 (1979-1980 Reg. Sess.). (See Stats. 1979, ch. 773, § 1, p. 2645; Sen. Bill No. 480 (1979-1980 Reg. Sess.), approved by Governor, Sept. 19, 1979, Sen. Final Hist. (1979-1980 Reg. Sess.) p. 304.) "The original act caused several interpretative problems and was described in a legislative analysis as '[o]rganizationally . . . a singular horror, cluttered with superfluous and ambiguous provisions.' " (*Heller v. Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 38 [32 Cal.Rptr.2d 200, 876 P.2d 999], quoting Sen. Com. on Judiciary, background information to Sen. Bill No. 889 (1981-1982 Reg. Sess.).) Due to the

---

[4]The exceptions cover a wide variety of situations, such as: where the information must be conveyed in order to assist with diagnosis, where the information is disclosed to assist in obtaining payment for health care services rendered, where the information is provided to coroners or public agencies, where the information is provided to a court pursuant to order, where the information is provided pursuant to a search warrant, etc. (§ 56.10, subds. (b), (c).) None of the exceptions in section 56.10 are at issue here.

[5]After several amendments over the years, the definition of the term "medical information" is now found in section 56.05, subdivision (f), which describes it as "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment."

criticism, the bill was subject to a series of moratoria which prevented it from ever taking effect. (See *Pettus v. Cole* (1996) 49 Cal.App.4th 402, 425 [57 Cal.Rptr.2d 46].) In 1981, the 1979 CMIA was repealed by Senate Bill No. 889 (1981-1982 Reg. Sess.) and an overhauled version was enacted. (Stats. 1981, ch. 782, §§ 1.5, 2, p. 3040.)

The provision pertaining to disclosure of general information now contained in section 56.16 was substantially changed between 1979 and 1981. The differences between the 1979 and 1981 versions provide particular insight into the Legislature's intent concerning the proper interpretation of the statutory language. The 1979 version, then found in section 56.18, provided: "Upon an inquiry as to the presence or general condition of a specific patient, a hospital or other health care facility may, unless otherwise requested by the patient, next of kin or the provider of health care, release at its discretion none, part or all of the following information: the patient's name, address, age and sex, *reason for admission*, general nature of injuries, or the general condition of the patient. *The hospital or other health care facility shall notify the patient or next of kin, and the provider of health care of the provisions of this section as soon as possible after the admission of the patient.*" (Italics added; Stats. 1979, ch. 773, § 1, pp. 2649-2650.)

There was a proposal to restrict release of general information to situations where the patients or next of kin had been advised of their right to privacy and the hospitals or health care facility obtained a written waiver from either the patients or the next of kin. (See Assemblyman Art Torres, letter to Elizabeth M. Guerra, Director, San Antonio Community Hospital, re Sen. Bill No. 480 (1979-1980 Reg. Sess.) Jan. 12, 1980.) This proposal was quelled by members of the news media, who expressed concern that "[w]hen a prominent citizen has a heart attack now, we can call the hospital and find out that patient's general condition without having to bother the immediate family, which is what we will be forced to do if your amendment is accepted" and that the news media would be unable to perform its function of quelling rumors when a spectacular accident or crime occurred. (Communities of Los Angeles Suburbia Newspapers, letter to Assemblyman Art Torres re Sen. Bill No. 480 (1979-1980 Reg. Sess.) June 27, 1979.) It was also pointed out that the proposal would "effectively force[] another bureaucratic headache on hospital administrators, who will be forced to add another line to admission forms, another unnecessary line to be filled out by overworked and harried staff people, nurses, patients and family members." (*Ibid.*)

When the final language of former section 56.18 was before the Legislature for review, concern was expressed that the provision would make

medical information too readily available: "This section allows a hospital or health care facility to release information concerning the facts and status of admission without the consent or knowledge of the patient. The bill permits the press, an insurance carrier, employer, or any stranger to inquire concerning the status of a patient." (California Applicants' Attorneys Association, mem. of Statement of Opposition to Sen. Bill No. 480 (1979-1980 Reg. Sess.) Apr. 23, 1979; California Trial Lawyers Association, mem. of Statement of Opposition to Sen. Bill No. 480 (1979-1980 Reg.Sess.) Apr. 23, 1979.)

Despite the opposition, the provision was included in the 1979 act as set forth above. Interestingly, however, the 1979 version of the CMIA also contained a specific provision forbidding the disclosure of "*any* individually identifiable medical information regarding a patient to that patient's *employer* or union or a person to whom the patient is applying for employment without an authorization from the patient . . . ." (Stats. 1979, ch. 773, § 1, p. 2650, italics added.) Arguably, this could have precluded hospitals or medical facilities from revealing to an employer the type of general information concerning patient status that could freely be disclosed to the news media or strangers.

In any event, as we have said, the 1979 version of the CMIA never went into effect due to persistent criticism. Particular displeasure was directed at former section 56.18. One problem that arose had to do with the breadth of the provision. An attorney for the California Association of Hospitals wrote: "Section 56.18 of the statute has been the cause of the majority of S.B. 480 concerns and inquiries, at least from the perspective of the hospital. . . . [¶] Initially, questions have arisen concerning which patients are actually covered by the provision. Since the second sentence refers to notice 'as soon as possible after the <u>admission</u>' (emphasis added) we have assumed that only formally admitted inpatients are covered by the provision. According to current hospital law, outpatients and emergency room patients are not formally admitted and therefore were not intended for coverage by the statute." (Attachment to letter from California Hospital Association to Governor Edmund G. Brown, Jr., Sept. 21, 1981, pp. 11-12.)

A separate concern was raised as to the troubles that could arise due to the requirement of giving notice to patients of their rights under the CMIA: "We have indicated our opinion that written notice in the conditions of admission form is sufficient (since only 'admitted' patients have the right to notice). Others have interpreted the provision to require written notice to all patients . . . and some have indicated that such notice must be on a separate piece of paper, in eight-point type, etc. . . . [¶] . . . [¶] In this same area, what

should be done in the case of an unconscious patient or a patient undergoing surgery? The wording of § 56.18 implies that unless otherwise requested, patient information may be released. We have interpreted this to mean that information regarding a patient may be released even though he may not yet have been given notice of his statutory right to request that information not be released. The ambiguity here creates the issue of determining whether releases are presumed authorized at all times or only after notice has been received." (Attachment to letter from California Hospital Association to Governor Edmund G. Brown, Jr., *supra*, Sept. 21, 1981, pp. 12-13.)

Finally, concern was expressed that a patient's desire to limit release of general information to certain inquirers but not others would lead to an administrative nightmare: "To allow the patient to differentiate on the basis of the nature or identity of the caller would, in our mind, unduly burden the hospital with additional administrative work. We believe that this could not have been the intent of the legislature and have advised hospitals that they are under no duty to differentiate their response to inquiry based upon the caller's identity." (Attachment to letter from California Hospital Association to Governor Edmund G. Brown, Jr., *supra*, Sept. 21, 1981, pp. 13-14.)

The drafters of the 1981 CMIA clearly took the above criticisms to heart because the 1981 version of the provision at issue: (1) deleted the reference to "hospitals" and "reason for admission," allowing the provision to apply more broadly to patients of all kinds under the care of any type of health care provider; (2) omitted all reference to the earlier requirement that notice be given to patients of their rights under the CMIA with respect to the release of general medical information; and (3) added the requirement of "a specific written request by the patient" to prevent disclosure of general medical information.

The 1981 CMIA also omitted the separate provision that prohibited disclosure to employers, unions, and potential employers. In its stead were provisions restricting the "use and disclosure of medical information by employers." (Stats. 1981, ch. 782, § 1, p. 3045.) Opponents argued that this meant "employers can get medical information about employees without their permission regardless of relevance to the employee's ability to do the job, and that this infringes upon a worker's right of privacy in matters of health." (Governor's Office, Legal Affairs Section, Enrolled Bill Rep. on Sen. Bill No. 889 (1981-1982 Reg. Sess.) Sept. 28, 1981).) The bill was recommended for passage and enacted over these reservations. (*Ibid.*)

Under the rules governing statutory construction, when the Legislature enacts an amendment, we presume that this " 'indicates that it thereby

intended to change the original act by creating a new right or withdrawing an existing one.' " (*Froid v. Fox* (1982) 132 Cal.App.3d 832, 837 [183 Cal.Rptr. 461].) " 'Therefore, any material change in the language of the original act is presumed to indicate a change in legal rights.' " (*Ibid.*; accord, *Davis v. Harris* (1998) 61 Cal.App.4th 507, 511 [71 Cal.Rptr.2d 591].) The changes between the 1979 version of the provision at issue and the 1981 version—the version in effect to this day despite numerous amendments to other parts of the CMIA—indicate a legislative intent to permit disclosure of general information without imposing burdensome paperwork or administrative requirements on medical providers which could too easily lead to technical violations of the act and litigation over inconsequential disclosures. This has direct bearing on many of the arguments advanced in appellant's brief.

Appellant complains that she "did not know about the provisions of the CMIA"; respondent "did not discuss these requirements with her" or "tell her that he was 'privileged' to discuss certain facts about her medial care and treatment' "; and failed "to inform [her] that she needed to put in writing her request that he not disclose information . . . ." But by amending the provision and deleting the former requirement that notice be given to patients of their rights under the CMIA prior to or in connection with disclosure of general medical information, the Legislature clearly expressed its intent that notice *not* be a prerequisite to casual disclosure of general information. The Legislature must have been aware that patients would be unlikely to know the technical requirements of the statute and that the changes between the 1979 version and the 1981 version of the language meant that release of general information would rarely, if ever, be precluded. By omitting the formal notice requirement, it chose to place the burden on patients seeking to withhold general information about their condition rather than on physicians who might casually or inadvertently reveal it.

Appellant repeatedly stresses the evidence that she *orally* told respondent that she did not want her condition to be discussed with her employer in any way. Section 56.16 is clear that to prevent a provider from revealing information of a general nature, there must be "a specific written request by the patient to the contrary . . . ." We are obliged to interpret the statute in accordance with its plain language and the intent of the Legislature. By providing only oral notice, appellant did not comply with the statutory prerequisite to nondisclosure.

Appellant indicates that respondent should have realized that Lombard, her supervisor at work, did not have benign motives in inquiring after her health and intended to use the information against her. As we have seen, the original CMIA enacted in 1979 treated employers (along with potential

employers and unions) differently with respect to medical information about an employee. It arguably prohibited *any* disclosure to these entities. However, in the interim between the enactment of Senate Bill No. 480 and Senate Bill No. 889, the Legislature must have realized the impracticality of imposing restrictions on disclosures to employers when general information could be freely revealed to family members, friends, the media, and even complete strangers. As the California Hospital Association said, to be forced to differentiate on the basis of the nature or identity of the inquirer would unduly burden medical facilities with additional administrative work. Seen in this light, appellant's expectation that busy physicians should be expected to recall oral instructions not to speak to a specific party such as an employer was not reasonable under the statute.

## II

■ This leads us to the central issue—whether the information revealed by respondent was sufficiently nonspecific to fall within the exception contained in section 56.16. Appellant contends that the answer must be in the negative because respondent talked to Lombard about facts concerning appellant that are clearly included within section 56.05's definition of "medical information." That is correct, but reflects a basic misunderstanding of how section 56.16 works.

■ The statute expressly permits medical providers to reveal two types of information: (1) "the patient's name, address, age, and sex"; "a general description of the reason for treatment"; "the general nature of the injury"; and "the general condition of the patient" *and* (2) "any information that is not medical information as defined in . . . Section 56.05." (§ 56.16.) There is no question that "the patient's name, address, age, and sex" when combined with "a general description of the reason for treatment"; "the general nature of the injury"; and "the general condition of the patient" comprise "medical information." That term is broadly defined in section 56.05, subdivision (f) to include "any individually identifiable information . . . regarding a patient's medical history, mental or physical condition, or treatment." But section 56.16 permits medical providers to reveal medical information as long as it fits within the described categories of general description of the reason for treatment, general nature of the injury, and general condition of the patient. In other words, the plain language of the statute reflects the Legislature's intent that general information of the kind outlined in section 56.16 can be revealed despite the fact that it falls within the definition of "medical information" under section 56.05 and is otherwise precluded from disclosure by section 56.10. ■ Thus, the significant

issue here is not whether the information provided was "medical information" but whether it was limited to "a general description of the reason for treatment" or "the general nature of the injury" or "the general condition of the patient . . . ." (§ 56.16.)

Appellant contends that the trial court improperly ruled that expert testimony was required to resolve this issue. We do not read the court's decision as resting on that ground. Although after hearing respondent's testimony indicating that the information he disclosed did not fall under the definition of "medical information," the court expressed the opinion that expert opinion might be required to resolve the issue, by the time of the directed verdict hearing, the court had focused on the language of section 56.16. The court stated on the record: "[Section 56.16 is] a specific statute which indicates that 'unless there's a specific written request by the patient to the contrary, nothing in this part shall be construed to prevent a provider upon an inquiry concerning a specific patient from releasing at its discretion any of the following information:'—which includes a general description of the reason for treatment, the general nature of the injury or condition, the general condition of the patient, and any information that is not medical information."

The court did go on to state its belief that expert testimony was required to resolve the issue of whether the information disclosed by respondent to Lombard was in fact "medical information." With respect to this argument, the court stated that it construed respondent's testimony that his comments to Lombard were "general symptoms as to the nature of the patient rather than confidential medical condition" to be "an expert medical opinion." The court expressed the view that "a doctor's opinion" should be used to "construe what medical information under that statute would be." It may be that resolution of the issue of whether or not a particular piece of information disclosed by a doctor was or was not "medical information" would be aided by expert opinion. Here, however, the issue need not be reached because respondent's defense primarily rested on the contention that the information he discussed with Lombard was a general description of the reason for treatment, the nature of appellant's injury, and/or her condition. By ordering a directed verdict, the trial court resolved the issue as a matter of law based on the uncontested testimony concerning what respondent said to Lombard. We review the decision de novo and agree with the trial court.

■ Our review of the legislative history leads us to conclude that the section 56.16 exception represents a pragmatic solution to the problem faced by health care providers surrounded by concerned friends and family of a patient or members of the media when the patient is a public figure. In

determining the statute's applicability, the question to be addressed is whether the provider gave out more information than one would expect to be disclosed to concerned friends or relatives inquiring about the condition of a loved one or to members of the media calling to find out the condition of a hospitalized public official or celebrity. According to the evidence, respondent told Lombard that appellant was suffering from itching and a fair amount of stress but had no other serious symptoms. He "probably" also told him that appellant would be unable to return to work at that time. In response to a question by Lombard about a CAT scan or ultrasound, respondent said he knew nothing about any additional diagnostic tests.

 The fact that a patient is suffering stress but is otherwise doing well seems to us to be exactly the type of innocuous information that medical providers can, and often do, reveal to casual inquirers. Respondent did not reveal the underlying diagnosis—that appellant was suffering from anxiety and/or depression and possibly needed psychiatric treatment.

Appellant goes to great length to explain away her deposition testimony, that she complained to Lombard and perhaps a dozen others that she was suffering from "job-related stress." At trial, appellant "recalled talking only about unfair treatment and harassment, not job related stress as a medical symptom caused by the harassment" and further explained "that she had discussed only that the workplace atmosphere was one of unfair treatment and that when she responded to the questions at deposition, she was thinking about job related issues, things that were causing the stress and that she talked to the people at work about the unfair treatment in the workplace and sought to change it . . . ." Appellant contends that created "a disputed issue of fact for the jury's determination about whether [appellant] told her employers about the stress."

 The fact that the patient has openly discussed information about his or her medical condition with third parties is appropriately seen as a waiver of rights in a lawsuit against a medical provider for violation of the CMIA. As the court stated in *Pettus v. Cole, supra,* 49 Cal.App.4th at pages 448-449, a case involving similar claims against a psychiatrist: "If [plaintiff] himself disclosed the damaging information he claims [defendants] revealed to his supervisors . . . , he will be hard pressed to claim any legally protected 'privacy' interest with respect to that information. [Citation.] He will also have a difficult time proving as an ultimate fact the reasonableness of his expectation that [defendants] would maintain the confidentiality of information his supervisors already knew. [Citation.] Finally, even if the [defendants'] reports contained a broader range of embarrassing information or more detail about sensitive matters than [plaintiff] had already discussed

with [his employer and supervisors], [plaintiff's] argument that [defendants] 'seriously' interfered with his informational privacy rights will be greatly undermined if his supervisors already knew the essential facts about those matters." But it is not crucial to the defense that the patient has discussed her general condition with others. Disclosure of the patient's general medical condition is simply not actionable whether or not the patient has revealed it to third parties.

Turning to other information disclosed by respondent, the fact that appellant was suffering from a rash and itchiness might be sufficiently specific to lie outside the section 56.16 exception, but the evidence demonstrated that appellant's rash and itching were visible to her fellow employees, and that she herself talked to Lombard about it, seeking his advice about where to go for treatment.

Appellant attempts to persuade us that respondent's discussion of diagnostic testing with Lombard alone represented a serious breach of his duty to keep medical information confidential. Here again, however, the evidence indicated that it was appellant who first mentioned to Lombard the seriousness of her condition and her need for diagnostic testing in order to excuse her repeated absences from work. Lombard was simply following up on information given to him by appellant, and respondent's statement that he knew nothing about any tests cannot be seen as disclosing confidential medical information that Lombard did not already have.

The same is true with respect to appellant's claim that respondent wrongly told Lombard that she was not yet ready to return to work. Appellant asked respondent's office to provide a medical excuse for her absences in late March. An employer who receives a document purporting to contain a medical excuse for failure to appear at work should be able to verify its contents with the physician whose name appears on it without either party violating the CMIA.

Appellant makes the argument that respondent should have said nothing rather than "g[i]ve the employer information that might have been contrary to information she communicated directly." We cannot impose a limitation on section 56.16 that does not appear in the statute. The statute permits medical providers to disclose certain kinds of information. If the information falls within the exception, a medical provider cannot be sued under the CMIA for discussing it. The fact that the provider's words may have had the unintended consequence of causing an employer to believe, correctly or incorrectly, that an employee was less ill than represented is not grounds for suit under the statute.

In sum, our analysis leads us to agree with the trial court that appellant failed to present sufficient evidence to support a judgment under the CMIA.

## III

Appellant contends that the court erred in granting a directed verdict on her separate claim for invasion of privacy, because section 56.16 is irrelevant to such a claim. At the hearing on the directed verdict, the court stated that "it seems to be incongruous . . . if a doctor could reveal the general nature of information and somehow a patient could then say that she had an agreement with the doctor that nothing was to be told to her employer . . . , and that would then cause the doctor to be subject to a right of privacy lawsuit in which a jury could determine that, when the law allows the doctor on the one hand under 56.16 to reveal that information legally[] . . . [t]hat is an illogical result that the law cannot allow."

We do not agree with the court on this point. The CMIA expressly states that its protections are "[i]n addition to any other remedies available at law . . . ." (§ 56.35.) It is theoretically possible, therefore, for a disclosure that does not violate the CMIA to be a violation of the patient's right to privacy. We believe, however, that such situations would be rare, and agree with respondent that appellant's case is not such a situation.

The Supreme Court explained in *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 39-40 [26 Cal.Rptr.2d 834, 865 P.2d 633]: "[A] plaintiff alleging an invasion of privacy in violation of the state constitutional right to privacy must establish each of the following: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy. [¶] Whether a legally recognized privacy interest is present in a given case is a question of law to be decided by the court. [Citations.] Whether plaintiff has a reasonable expectation of privacy in the circumstances and whether defendant's conduct constitutes a serious invasion of privacy are mixed questions of law and fact. If the undisputed material facts show no reasonable expectation of privacy or an insubstantial impact on privacy interests, the question of invasion may be adjudicated as a matter of law."

With respect to reasonable expectation, the court stated: "[T]he plaintiff in an invasion of privacy case must have conducted himself or herself in a manner consistent with an actual expectation of privacy, i.e., he

or she must not have manifested by his or her conduct a voluntary consent to the invasive actions of defendant. If voluntary consent is present, a defendant's conduct will rarely be deemed 'highly offensive to a reasonable person' so as to justify tort liability." (*Hill v. National Collegiate Athletic Assn., supra,* 7 Cal.4th at p. 26, quoting Rest.2d Torts, § 652B, com. c.) The court cited *Melvin v. Reid* (1931) 112 Cal.App. 285, 290 [297 P. 91], for the proposition that "There can be no privacy in that which is already public."

With respect to the seriousness of the invasion, the court stated: "No community could function if every intrusion into the realm of private action, no matter how slight or trivial, gave rise to a cause of action for invasion of privacy. . . . Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right. Thus, the extent and gravity of the invasion is an indispensable consideration in assessing an alleged invasion of privacy." (*Hill v. National Collegiate Athletic Assn., supra,* 7 Cal.4th at p. 37.)

The court applied these rules in *Heller v. Norcal Mutual Ins. Co, supra,* 8 Cal.4th 30 where the plaintiff brought suit against her treating physician and others for violation of the CMIA. The plaintiff had previously been a patient of the defendant physician's associate until the associate's treatment of a medical problem caused her to sue for malpractice. After the malpractice suit was filed, the defendant physician was interviewed by the medical malpractice carrier, during which "he discussed plaintiff's condition and prognosis and disclosed [her] medical records." (*Id.* at p. 36.) The trial court dismissed on the ground that the communication was covered by the litigation privilege. The Court of Appeal reversed, concluding that "although the medical information obtained by [the carrier] from [the defendant physician] may have been legally discoverable during the course of the [malpractice] litigation, the *method* used to discover the information (i.e., private conversations that took place before the issuance of subpoenas and notice of depositions), violated section 56 et seq. and plaintiff's constitutional right to privacy." (*Id.* at p. 37.) In so holding, the Court of Appeal rejected the defendants' claim that the action was barred by the litigation privilege contained in section 47, subdivision (b). (*Heller,* at p. 37.)

The Supreme Court reversed the Court of Appeal, concluding with respect to the CMIA claim, that the ex parte contact fell under one of the exceptions to the act. (*Heller v. Norcal Mutual Ins. Co, supra,* 8 Cal.4th at pp. 38-42.) The court analyzed the constitutional right of privacy claim separately, supporting our view that such claims are not necessarily barred by the

statutory exceptions found in the CMIA. The court's analysis centered around the plaintiff's reasonable expectation of privacy and the seriousness of the invasion of her privacy rights under the circumstances. With respect to the former, the court concluded: "By placing her physical condition in issue in the [malpractice] litigation, plaintiff's expectation of privacy regarding that condition was substantially lowered by the very nature of the action." (*Id.* at p. 43.) With regard to the latter, the court stated: "The discussions between [the defendant physician] and [the carrier] could not be considered sufficiently serious in their scope or impact to give rise to an actionable invasion of privacy. [Citation.] Because the information would most likely have been discovered during the ordinary course of litigation, defendants' conduct in revealing information about plaintiff's treatment and physical condition does not violate the state constitutional guarantee against invasion of privacy as a matter of law." (*Id.* at p. 44.)[6]

 For similar reasons, appellant had no reasonable expectation of privacy in the information conveyed to Lombard, and respondent's disclosures cannot be seen as substantial violations or her right to privacy. The fact that she herself told Lombard about the rash and itching and asked for his advice about where to go for medical treatment meant that she could not have held an expectation of privacy with regard to that condition. She also brought up the subject of diagnostic testing to Lombard, and asked that respondent and other doctors provide notes excusing her absences from work during February, March, and April 1999. Thus, her complaints about respondent's brief mention of testing and prognosis for return to work ring hollow. Finally, with respect to the stress allegedly caused by her work environment, appellant admitted telling numerous people that the work environment was "unfair," "abusive," and "sexist," and that she was subject to "harassment," "unfair treatment," "unfair demands," and "persecution" over a lengthy period of time. This culminated in a resignation letter in which she stated that her working conditions were "unbearable," and that she could "no longer be subjected to the harassment she had to endure," and a lawsuit against her employer. In this atmosphere, respondent's disclosure of the fact that appellant was suffering from work-related stress does not rise to the level required to sustain a constitutional right to privacy claim. Her continuous and open discussion of feelings of unfair treatment and abuse undermine her claim that respondent seriously interfered with her privacy rights.

---

[6]The court "[did] not reach plaintiff's claim that a constitutional invasion of privacy defeats application of the litigation privilege." (*Heller v. Norcal Mutual Ins. Co., supra,* 8 Cal.4th at p. 44.)

## DISPOSITION

The judgment is affirmed.

Vogel (C. S.), P. J., and Hastings, J., concurred.